# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 01-1034

———————

United States of America,　　　　　　　*
　　　　　　　　　　　　　　　　　　　*
　　　　　　　Appellant,　　　　　　　*　Appeal from the United States
　　　　　　　　　　　　　　　　　　　*　District Court for the
　　　v.　　　　　　　　　　　　　　　*　District of South Dakota.
　　　　　　　　　　　　　　　　　　　*
Manuel Rodriguez-Arreola,　　　　　　 *
　　　　　　　　　　　　　　　　　　　*
　　　　　　　Appellee.　　　　　　　　*

———————

Submitted: June 12, 2001
Filed: October 12, 2001

———————

Before BOWMAN and HEANEY, Circuit Judges, and KOPF,[1] District Judge.

———————

BOWMAN, Circuit Judge.

During the routine stop of a vehicle for speeding, a South Dakota highway patrol officer discovered that Manuel Rodriguez-Arreola, a passenger in the vehicle, was an illegal alien. Rodriguez was detained and later charged under 8 U.S.C. § 1326(a) (Supp. IV 1998) with being an illegal alien present in the United States

———————

[1]The Honorable Richard G. Kopf, Chief Judge, United States District Court for the District of Nebraska, sitting by designation.

after deportation.[2]  Rodriguez filed a motion to suppress all evidence obtained during the traffic stop, arguing that his status as an illegal alien was discovered through questioning that violated his Fourth Amendment rights.  The District Court granted Rodriguez's motion to suppress and the government appeals.  We reverse.

I.

While traveling west on I-90, South Dakota Highway Patrol Officer Christopher Koltz noticed a vehicle approaching from the opposite direction.  His radar recorded the vehicle's speed at eighty-six miles per hour—eleven miles per hour in excess of the posted speed limit.  Trooper Koltz then crossed the interstate median and accelerated in order to overtake and stop the speeding vehicle.

Trooper Koltz activated a video recording system before exiting his patrol car, and all events and conversations during the stop were recorded.  He approached the stopped vehicle and requested that the driver, Estaban Molina, provide his license and registration.  He informed Molina that he had been stopped for speeding and instructed him to step out of the vehicle and to take a seat in the front of his patrol car.  Trooper Koltz showed Molina the speed that the radar had recorded and informed Molina that he was going to issue him a ticket.  While preparing the ticket, Trooper Koltz asked Molina a variety of general questions, after which he asked Molina whether he was a United States citizen or a resident alien.  Molina first answered that he was neither a United States citizen nor a resident alien.  In order to confirm Molina's admission that he was an illegal alien, Trooper Koltz asked Molina whether he had a green card.  After a somewhat confusing conversation between Molina and Trooper Koltz, Molina was able to convey that he was a legal alien but

---

[2]The one-count indictment further alleges that Rodriguez qualifies for a sentence enhancement based on his previous conviction in an Oregon state court for the delivery of heroin.  See 8 U.S.C. § 1326(b)(2) (1994 & Supp. IV 1998).

that he had left his green card at home. Trooper Koltz then asked Molina whether his passenger was a legal alien and had a green card. Molina answered no.[3]

Trooper Koltz finished writing the ticket and had Molina sign it. He told Molina that he was going to run a check of his license over the radio and that while waiting on the results, he would walk his dog around the car to make sure there were no drugs.[4] Trooper Koltz instructed Molina to step out of his patrol car and had him stand on the shoulder of the road. Trooper Koltz proceeded to the vehicle and motioned for Rodriguez, the only passenger in the vehicle, to exit. After Rodriguez exited the vehicle, Trooper Koltz asked him whether he was a legal resident. He answered no.[5] Trooper Koltz further inquired as to whether Rodriguez possessed a

_____

[3]Trooper Koltz asked Molina:

Q:     How about your friend up here that you're traveling with, is he a
        legal alien? Does he have a green card?
A:     No (inaudible)
Q:     He does or he doesn't?
A:     (inaudible)

United States v. Rodriguez-Arreola, No. CR 00-40071 (D.S.D. Nov. 21, 2000) (appendix A to Magistrate Judge's Report and Recommendation).

[4]As one of the highway patrol's canine handlers, Trooper Koltz's job included the detection of illegal drugs.

[5]Trooper Koltz's questioning of Rodriguez proceeded as follows:

Q:     How well do you understand English, sir?
A:     Nada.
Q:     Nada, huh? I'll bet you do. Do I need to get INS on the phone?
A:     (inaudible-seemingly confused)
Q:     INS?
A:     Huh?

-3-

green card. In response, Rodriguez produced only a Washington State identification card with his name on it, but not a green card.[6] See United States v. Rodriguez-Arreola, No. CR 00-40071, at 17 (D.S.D. Nov. 6, 2000) (transcript of motion hearing).

Trooper Koltz then had Rodriguez join Molina on the shoulder of the road so that he could use his canine to search the vehicle. After his search of the vehicle failed to discover any drugs,[7] Trooper Koltz put his canine back in the patrol car and

---

Q:     INS?
A:     (inaudible).
Q:     Okay, is that how we're going to play it? Are you a legal . . . a
       resident of this country?
A:     No. (inaudible)

Rodriguez-Arreola, No. CR 00-40071 (appendix B to Magistrate Judge's Report and Recommendation).

[6]Trooper Koltz's questioning of Rodriguez continued:

Q:     Where's your green card?
A:     (defendant produces something from his wallet)
Q:     That's not a green card. Where's your green card?
A:     (inaudible-shaking head)
Q:     Yeah, you know what I'm talking about. You don't have one, do
       ya?
A:     No. (shaking head)
Q:     No. You're not here legally are you?
A:     (shaking head)

Rodriguez-Arreola, No. CR 00-40071 (appendix B to Magistrate Judge's Report and Recommendation).

[7]The canine alerted four times to the presence of drugs on the exterior of the vehicle. Based on these alerts, Trooper Koltz had his canine sniff the interior where

proceeded to perform a radio check on Rodriguez. Through dispatch, he also contacted an Immigration and Naturalization Service (INS) agent to assist in an investigation of the immigration status of Molina and Rodriguez, whom he suspected to be illegal aliens due to their responses. After providing the INS agent with the full names of Molina and Rodriguez, the agent asked Trooper Koltz follow-up questions regarding Rodriguez. Due to his inability to converse with Rodriguez in Spanish, Trooper Koltz allowed the INS agent to talk directly with Rodriguez. Following his check of the identities of Molina and Rodriguez, the INS agent informed Trooper Koltz that while Molina was a legal alien, Rodriguez was not. After the radio check on Molina failed to disclose any outstanding warrants, Trooper Koltz gave Molina the speeding ticket and allowed him to go. At the request of the INS, Trooper Koltz placed Rodriguez into custody and took him to the nearest jail facility for processing by the INS. Viewing the immigration detention as part of an administrative procedure, neither the INS nor Trooper Koltz informed Rodriguez of his Miranda rights during the traffic stop.[8]

Prior to trial, Rodriguez moved to suppress "all evidence and statements obtained" during the traffic stop, particularly evidence and statements pertaining to his identity. United States v. Rodriguez-Arreola, No. CR00-40071 (D.S.D. Oct. 24, 2000) (Motion to Suppress). He argued that the evidence and statements were obtained through an illegal search and seizure that violated his Fourth Amendment rights. The Magistrate Judge held a hearing and subsequently recommended that the District Court grant Rodriguez's motion. See United States v. Rodriguez-Arreola, No.

---

it again alerted. Trooper Koltz then proceeded to search the interior by hand but was unable to locate any drugs. See Rodriguez-Arreola, No. CR 00-40071, at 19-20 (transcript of motion hearing).

[8]Apparently, Rodriguez received Miranda warnings later when the INS decided to pursue criminal charges. See Rodriguez-Arreola, No. CR 00-40071, at 67-68 (D.S.D. Nov. 6, 2000) (transcript of motion hearing)

CR 00-40071, at 19 (D.S.D. Nov. 21, 2000) (Magistrate Judge's Report and Recommendation). The District Court adopted the Magistrate Judge's Report and Recommendation and granted the motion to suppress based on its conclusion that Rodriguez's Fourth Amendment rights were violated. The government filed an interlocutory appeal challenging the ruling pursuant to 18 U.S.C. § 3731 (1994).

We review the District Court's findings of fact for clear error. United States v. Stephenson, 924 F.2d 753, 758 (8th Cir.), cert. denied, 502 U.S. 813, 916 (1991). We review de novo, however, the District Court's ultimate legal conclusions drawn from the facts. United States v. Tavares, 223 F.3d 911, 914 (8th Cir. 2000). We will not reverse the District Court's decision regarding a motion to suppress "unless it is not supported by substantial evidence on the record; it reflects an erroneous view of the applicable law; or upon review of the entire record, the appellate court is left with the definite and firm conviction that a mistake has been made." United States v. Layne, 973 F.2d 1417, 1420 (8th Cir. 1992), cert. denied, 506 U.S. 1066 (1993).

II.

Initially we note that two aspects of the stop are not in dispute. First, Rodriguez does not argue that the initial stop of the vehicle for speeding was improper. Second, the government does not challenge the suppression of the incriminating statements Rodriguez made during his telephone conversation with the INS agent from Trooper Koltz's patrol car.[9] The District Court's suppression of all other evidence obtained during the stop appears to be in dispute.

---

[9]The government conceded at oral argument that it was not challenging the suppression of the incriminating un-Mirandized statements Rodriguez made to the INS official during this telephone conversation.

-6-

The government argues that Trooper Koltz did not violate the Fourth Amendment rights of Rodriguez. The government contends that the questions posed to Molina concerning his alienage were within the scope of the stop because they were based on a reasonable suspicion by Trooper Koltz.[10] The government further contends that even if Trooper Koltz's questions to Molina constituted an unconstitutional search and seizure, the questions only violated Molina's Fourth Amendment rights—a violation that Rodriguez does not have standing to assert. After Molina stated that the passenger in his vehicle did not have a green card, the government argues that Trooper Koltz had reasonable suspicion to ask Rodriguez about his citizenship status. Finally, the government argues that even if Trooper Koltz's questions constituted a Fourth Amendment violation, Rodriguez's identity is not suppressible as a matter of law.

Rodriguez contends that the questions posed by Trooper Koltz about alienage were outside the appropriate scope of the traffic stop and impermissibly extended the stop beyond its proper duration. He argues that these questions by Trooper Koltz violated his Fourth Amendment right to be free from illegal searches and seizures. Rodriguez also contends that evidence of his identity is equally as suppressible as the other evidence obtained during the stop. Therefore, he argues that all evidence obtained during the traffic stop should be excluded as the poisonous fruit of an unconstitutional search and seizure.

---

[10]Trooper Koltz listed multiple factors as raising his suspicion: the nervousness of Molina and Rodriguez; Molina's continued nervousness after being told why he was stopped and even after he learned of the Trooper's decision to issue him a ticket; Molina and Rodriguez were traveling on a long trip together although not related and of significantly different ages; the reluctance of Molina or Rodriguez to make eye contact; the car being extremely clean on the interior with no debris; no luggage visible on the interior of the vehicle as would be expected for a long trip to Chicago; and the car having Washington State license plates, which he considered a source state for illegal drugs. Rodriguez-Arreola, No. CR 00-40071, at 10-15 (D.S.D. Nov. 6, 2000) (transcript of motion hearing).

## A.

We first dispose of Rodriguez's claim that his Fourth Amendment rights were violated. In asserting that Trooper Koltz performed an illegal search and seizure during the course of the traffic stop, Rodriguez relies on the questions asked to Molina as a basis for establishing a violation of his rights. Even if Trooper Koltz violated Molina's Fourth Amendment rights—a question not before us—Rodriguez cannot use the violation of another individual's rights as the basis for his own Fourth Amendment challenge. See United States v. Payner, 447 U.S. 727, 731 (1980) ("[A] court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights."). In order for Rodriguez to establish a claim based on the questions asked to Molina, he must show that the "challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." Id. Rodriguez has no legitimate expectation of privacy in Molina's knowledge that Rodriguez was illegally present in the United States, and therefore he cannot contest Molina's statements.[11]

Rodriguez asserts that the government has waived any argument that he lacks the ability to challenge a Fourth Amendment violation of Molina's rights because the government never raised the argument before the District Court. The fact that Rodriguez cannot demonstrate an expectation of privacy in the statements made by Molina, however, means that he does not have standing to assert such a Fourth Amendment violation. See United States v. Stallings, 28 F.3d 58, 60 (8th Cir. 1994) ("In order to have standing to challenge a search or seizure under the Fourth

___

[11]Because we hold that Rodriguez cannot challenge the questions about alienage posed to Molina, we do not consider the government's argument that the questions did not violate the Fourth Amendment because, based on Trooper Koltz's suspicions, they were within the proper scope of the traffic stop.

Amendment, the defendant must have a legitimate expectation of privacy in the places or objects searched."). The government cannot waive Rodriguez's lack of standing, and therefore any argument based on waiver must fail. See Sierra Club v. Robertson, 28 F.3d 753, 757 n.4 (8th Cir. 1994) ("[I]t is elementary that standing relates to the justiciability of a case and cannot be waived by the parties.").

The Supreme Court has analogized roadside questioning during a traffic stop to a Terry stop, which allows an officer with reasonable suspicion to detain an individual in order to ask "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." Berkemer v. McCarty, 468 U.S. 420, 439 (1984); see also Terry v. Ohio, 392 U.S. 1 (1968). After Molina told Trooper Koltz that Rodriguez was not legally present in the United States, Trooper Koltz had reasonable suspicion to inquire into Rodriguez's alienage. Trooper Koltz then acted within the proper scope of this suspicion by asking Rodriguez whether he was a legal alien and had a green card. At this point, Trooper Koltz was still in a stage of investigation and attempting to confirm what Molina had told him. See United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000) ("[A]n officer may undertake similar questioning of other vehicle occupants to verify information provided by the driver."). Rodriguez was not in custody when he produced his Washington State identification card and answered that he was not a legal alien. This evidence is admissible even though Rodriguez had not yet received a Miranda warning.[12] See Berkemer, 468 U.S. at 440 ("The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda."). United States v. McGauley, 786 F.2d 888, 890 (8th Cir. 1986) ("No Miranda warning is necessary for persons detained for a Terry stop.").

_____

[12]Because the government does not appeal the suppression of statements Rodriguez later made to the INS agent from his patrol car, we do not need to consider whether Rodriguez should have received a Miranda warning prior to his making those statements.

Inasmuch as, for the reasons stated, Rodriguez-Arreola's Fourth Amendment rights were not violated, the District Court erred by granting his suppression motion, at least to the extent that the court's suppression order is challenged in this appeal.

B.

Our holding that no illegal search and seizure took place disposes of this appeal. Nevertheless, we address the government's argument, that "identity" is not suppressible even if gained through a Fourth Amendment violation, for the purpose of clarifying the posture in which this case comes to us and how the Supreme Court's decision in INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), and this Circuit's recent decision in United States v. Guevara-Martinez, No. 00-3855, 2001 WL 935871 (8th Cir. Aug. 20, 2001), apply to this case.

The District Court, in adopting the Magistrate Judge's Report and Recommendation, suppressed Rodriguez's Washington State identification card, his fingerprints, and statements that Rodriguez made to Trooper Koltz.[13] The government, based on its interpretation of the Supreme Court's decision in Lopez-

---

[13]The Magistrate Judge's Report and Recommendation states, "It is recommended, therefore, that all evidence resulting from Rodriguez' [sic] illegal detention, including his statement of his identity, his ID card, and his fingerprints be suppressed." United States v. Rodriguez-Arreola, No. CR 00-40071, at 19 (D.S.D. Nov. 21, 2000) (Report and Recommendation). The District Court adopted this recommendation, stating that "evidence resulting from the illegal detention of an alien can be suppressed at his criminal trial." United States v. Rodriguez-Arreola, No. CR 00-40071, at 4 (D.S.D. Dec. 22, 2000) (Memorandum Opinion and Order). We note that Trooper Koltz never asked Rodriguez for his name; rather, he asked Rodriguez if he had a green card, and Rodriguez produced his Washington State identification card bearing his name. Thus, when the Magistrate Judge referred to Rodriguez's "statement of his identity," we assume that the reference was either to the production of the ID card, or to Rodriguez's response to Trooper Koltz that he was not legally in the United States. Rodriguez never spoke his name during the encounter.

Mendoza, argues that "evidence of a defendant's identity is not suppressible" and that the District Court thus erred in suppressing those items of evidence. Appellant's Br. at 16 (emphasis added). A close reading of Lopez-Mendoza does not support the government's broad interpretation. The Court held in Lopez-Mendoza that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Id. at 1039. Thus, the Court rejected Lopez-Mendoza's objection to being compelled to appear at a deportation hearing following his unlawful arrest. The Ninth Circuit, applying Lopez-Mendoza, has held that in the prosecution of an illegal alien for reentry under 8 U.S.C. § 1326, the "defendant's identity need not be suppressed merely because it is discovered as the result of an illegal arrest or search." United States v. Guzman-Bruno, 27 F.3d 420, 421 (9th Cir.), cert. denied, 513 U.S. 975 (1994). The court interpreted Lopez-Mendoza as foreclosing the defendant's "attempt to suppress the fact of his identity." Id. at 422. The Ninth Circuit's opinion gives no indication that it was refusing to suppress specific physical evidence of any sort; it only indicates that the court declined to suppress the simple fact of who the defendant was.[14]

After a careful reading of both the District Court's order and the relevant case law, it is apparent that the government misunderstands the scope of the District

---

[14]In the context of a prosecution under § 1326, the Fifth Circuit has held that even if a defendant is unconstitutionally stopped and arrested, his identity cannot be suppressed. United States v. Roque-Villanueva, 175 F.3d 345, 346 (5th Cir. 1999). The Fifth Circuit's opinion does not mention fingerprints, statements, or other evidence obtained at the scene of the allegedly unlawful stop. Instead, it simply rejects that defendant's argument that his INS file should have been suppressed as fruit of the poisonous tree. The Tenth Circuit, in an unpublished opinion, has interpreted Lopez-Mendoza to prevent suppression of a defendant's statement of his name to an officer. See United States v. Cisneros-Cruz, No. 98-1398, 1999 WL 444926, at **6 (10th Cir. June 30, 1999) (unpublished). We again note that Rodriguez never stated his name to Trooper Koltz.

Court's suppression order and the import of <u>Lopez-Mendoza</u> and cases relying upon it. As our Circuit recently observed, "'The language in <u>Lopez-Mendoza</u> should only be interpreted to mean that a defendant may be brought before a court on a civil or criminal matter even if the arrest was unlawful.'" <u>United States v. Guevara-Martinez</u>, No. 00-3855, 2001 WL 935871, at *3 (8th Cir. Aug. 20, 2001) (holding that fingerprints obtained from an illegal alien as a result of an unconstitutional search and seizure are suppressible) (quoting <u>United States v. Mendoza-Carillo</u>, 107 F. Supp. 2d 1098, 1106 (D.S.D. 2000)). To the extent that Rodriguez or the government interpreted the District Court's suppression order to bar the present or future prosecution of Rodriguez under § 1326,[15] such an interpretation would violate the Supreme Court's holding in <u>Lopez-Mendoza</u>. We do not read the District Court's order to reach so far; under this Circuit's precedent and under <u>Lopez-Mendoza</u>, the government would not be prohibited from prosecuting Rodriguez for violating § 1326 so long as it used <u>untainted</u> evidence of his identity. <u>See</u> <u>United States v. Aldana-Roldan,</u> 932 F. Supp. 1455, 1456 (S.D. Fla. 1996) (holding, in a § 1326 prosecution, that "the Government is free to prove Defendant's identity so long as it can do so without relying upon the information it obtained from [the] unlawful stop").

IV.

In sum, we conclude that the government did not violate Rodriguez's Fourth Amendment rights. Except for the suppression of Rodriguez's statements made to the INS official, which the government does not contest, we reverse the District Court's suppression order and remand the case for further proceedings consistent with this opinion.

---

[15]The elements for establishing a violation of § 1326 are "that the defendant (1) is an alien, (2) was previously deported, and (3) has re-entered the United States without proper permission." <u>United States v. Gomez-Orozco</u>, 188 F.3d 422, 425 (7th Cir. 1999).

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. In my view, the district court correctly held that Trooper Koltz's immigration status questions unreasonably expanded the scope of the traffic stop because he had no reasonable, articulable suspicion of criminal activity. Therefore, all information obtained from Rodriguez after the inception of this questioning should be suppressed.

During a lawful traffic stop, law enforcement officers may engage in an investigation reasonably related to the stop. See United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994). "[A] reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." U.S. v. Foley, 206 F.3d 802, 805 (8th Cir. 2000) (citation omitted). If such questioning produces inconsistent answers, or if the license and registration are not in order, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive questions. Ramos, 42 F.3d at 1163. If, however, no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop. See id.

The majority concludes, on the basis of United States v. Payner, that Rodriguez cannot establish a violation of his Fourth Amendment rights because he had no legitimate expectation of privacy in Molina's knowledge that he was illegally present in the United States, and therefore cannot contest Molina's statements. See United States v. Payner 447 U.S. 727, 731 (1980). This reasoning condones Trooper Koltz's improper expansion of the scope of the traffic stop in order to elicit incriminating information about Rodriguez's alienage, and ignores Rodriguez's right to challenge the scope and duration of the stop.

While it is true that Rodriguez does not have standing to contest the statements made by Molina, he can contest his own statements if they were the product of an unreasonably protracted traffic stop. The right to be free from unnecessarily prolonged traffic stops applies to both drivers and passengers. See U.S. v. Jones, 234 F.3d 234, 241 (5th Cir. 2001) (because continued detention of driver and passenger was improper after routine questions failed to create reasonable suspicion, both were entitled to suppress evidence obtained as a result of a subsequent search). A law enforcement official may not unreasonably expand the scope of a routine traffic stop in order to obtain incriminating information about the passenger of a vehicle without violating that passenger's right to be free from unnecessary governmental detention. See id.; U.S. v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995) (once the purpose of an initial traffic stop is completed, an officer cannot further detain a vehicle *or its occupants* unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention) (emphasis added).

Trooper Koltz stopped Molina for speeding. Neither Molina's nor Rodriguez's immigration status was relevant to this traffic violation. Therefore, without a reasonable suspicion of additional criminal activity, the traffic stop and Trooper Koltz's attendant investigation should have concluded before either Molina or Rodriguez were questioned about immigration issues. See U.S. v. Restrepo, 890 F. Supp. 180, 195 (E.D.N.Y. 1995)("Unnecessarily prolonging a traffic stop for the purpose of eliciting information about a suspected unconnected violation for which there is no objective basis is not acceptable.").[16]

---

[16]Trooper Koltz was entitled to conduct a reasonable investigation related to the traffic stop by asking Molina about the identity of his passenger, and questioning the passenger to verify the information provided by the driver. United States v. Edmisten, 208 F.3d 693, 694 (8th Cir. 2000). In this case however, Trooper Koltz did not even bother to ask Molina about Rodriguez's identity. Instead he first asked Molina whether his passenger was "a legal alien", and whether his passenger had "a green card." United States v. Rodriguez-Arreola, No. CR 00-40071 (D.S.D. Nov. 21,

To justifiably expand the scope of the traffic stop, Trooper Koltz was required to observe particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed. See United States v. Beck, 140 F.3d 1129, 1136 (8th Cir.1998). Trooper Koltz listed several factors to support his suspicion of criminal activity, including: the nervousness of Molina and Rodriguez; the failure of Molina and Rodriguez to make eye contact; the age difference between Molina and Rodriguez; the lack of a familial relationship between Molina and Rodriguez, a car interior devoid of luggage and debris, and license plates from the State of Washington.[17] I agree with the magistrate judge, and the district court judge, that these factors do not support Trooper Koltz's suspicion of drug trafficking activity, nor do they support his suspicion that Molina and Rodriguez were illegal aliens.

As we noted in Beck, factors such as the absence of luggage in the interior of a vehicle, and the presence of out-of-state plates from alleged "source" states are insufficient to support reasonable suspicion. See id. at 1137-39. Also, failing to make eye contact with a questioning police officer, and traveling with an individual of a different age and familial background, does not indicate that criminal activity is afoot. The government has failed to cite any authority, nor have I discovered any, to support the proposition that these factors were adequate to provide reasonable

_____

2000)(appendix A to Magistrate Judge's Report and Recommendation).

[17]Trooper Koltz stated that Molina appeared nervous and failed to make eye contact during the traffic stop, even after he was informed of the reason for the stop. This cannot be considered suspicious because during the traffic stop, Molina was confronted by a suspecting law enforcement officer who was accompanied by a large barking police dog. Although under certain circumstances nervousness may be considered suspicious, under the facts presented here, such nervousness was not unusual. See United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998)("It certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.").

suspicion. The initial stop by Trooper Koltz in this case was proper. However, he should have completed the stop by issuing a citation for speeding and returning Molina's driver's license. After that point, Trooper Koltz needed a reasonable articulable suspicion to detain Molina and Rodriguez for additional investigation. The factors cited by Trooper Koltz as providing reasonable suspicion, however, do not differ from those that would be expected from law abiding travelers. By the time Trooper Koltz asked Molina about Rodriguez's immigration status, the scope of the traffic stop had been impermissibly expanded and any information obtained afterwards could not be used to justify further inquiry. I would therefore affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.