# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————————

No. 03-2182

————————

United States of America,

           Appellee,

v.

Gloria Rodriguez-Hernandez, also
known as Ana Maricela Hernandez,

           Appellant.

\*
\*
\*
\*
\*  Appeal from the United States
\*  District Court for the District
\*  of South Dakota.
\*
\*
\*
\*

————————

Submitted:  December 16, 2003

Filed:  December 24, 2003

————————

Before MORRIS SHEPPARD ARNOLD, HEANEY, and FAGG, Circuit Judges.

————————

FAGG, Circuit Judge.

Gloria Rodriguez-Hernandez conditionally pleaded guilty to illegally reentering the United States after deportation in violation of 8 U.S.C. § 1326(a). Rodriguez-Hernandez appeals challenging the district court's[*] partial denial of her motion to suppress. We affirm.

———————————

[*]The Honorable Lawrence L. Piersol, Chief Judge, United States District Court for the District of South Dakota.

At 12:39 a.m. on December 9, 2002, South Dakota Deputy Sheriff Decker stopped a vehicle driven by Gerardo Ayon for a traffic violation on a South Dakota highway. All events and conversations during the encounter were recorded on the deputy's video equipment. The deputy approached the car and asked Ayon for his driver's license and vehicle registration. Ayon produced a California driver's license and told the deputy he had just purchased the vehicle. At 12:40 a.m., Deputy Decker also requested identification from the front-seat passenger, Rodriguez-Hernandez, and she responded, "No English." Ayon told the deputy Rodriguez-Hernandez did not have identification with her. Deputy Decker asked Ayon to step out of the car, and as he did so, Decker noticed a folding knife in the pocket of the driver's side door. The deputy also observed the shaft of an ink pen with white residue on it, which he believed was used to ingest illegal drugs. Deputy Decker asked Ayon for permission to conduct a pat-down search, and Ayon agreed. During the pat-down, the deputy believed he felt a drug scale in Ayon's pocket. Decker told Ayon to take a seat in the patrol car, and called for back up because he had located a weapon and suspected drug paraphernalia.

Deputy Decker returned to the stopped vehicle and spoke with a male passenger in the back seat of the car. The passenger stated he did not have any identification with him. The passenger stepped out of the car and agreed to a pat-down search. Decker asked the passenger about his place of birth and whether he had a green card. The passenger stated his identification was in New Mexico. The deputy then asked the passenger whether he was in this country illegally, and the passenger said, "No." At 12:46 a.m., Decker returned to his patrol car, where Ayon remained seated. Decker asked Ayon whether his passengers were in this country illegally, and Ayon stated they were. Deputy Decker then said, "They are illegals?" and Ayon responded that they had work permits. At 12:50 a.m., Decker called state radio about Ayon's driver's license information and learned Ayon's license restricted him to driving to and from work. Ayon tried to convince the deputy that his driving from

Los Angeles to Nebraska and back looking for work qualified as permissible driving under his restricted license.

Deputy Decker's backup, Deputy Palmer, arrived on the scene at 12:56 a.m. Decker asked Palmer to help with the passengers by taking them to Palmer's patrol car. At Decker's request, Palmer called Border Patrol and instructed the passengers to talk with a border patrol agent. Miranda warnings were not given. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). Each passenger spoke with the agent for less than five minutes. Palmer then spoke with the border patrol agent who stated both passengers were in the country illegally and should be detained. Ayon, Rodriguez-Gonzales, and the male passenger were then transported to the county jail, where they arrived at 2:26 a.m. Later the same morning, INS agent Baird sent two detention officers to the jail to pick up Rodriguez-Hernandez and bring her to Sioux Falls for an interview. Rodriguez-Hernandez arrived there at 8:50 a.m. Before the interview, Rodriguez-Hernandez's fingerprints were taken and compared to fingerprints in the INS database. The fingerprints indicated Rodriguez-Hernandez had been previously deported.

INS agent Baird wore plain clothes for his interview with Rodriguez-Hernandez. He did not use force or intimidation. Baird read Rodriguez-Hernandez her Miranda rights in Spanish before starting the interview, which lasted twenty minutes. Rodriguez-Hernandez seemed to understand and signed a document indicating she understood her rights. During the interview, Rodriguez-Hernandez admitted she reentered the United States illegally after being deported.

The district court partially denied Rodriguez-Hernandez's motion to suppress. The district court concluded the scope of the traffic stop was not impermissibly expanded when Rodriguez-Hernandez was instructed to speak with Border Patrol about her immigration status. Nevertheless, the court held the Border patrol conversation was custodial, and thus, the conversation should have been preceded by

Miranda warnings. Since no warning was given, the district court concluded Rodriguez-Hernandez's admission to the border patrol agent was not admissible, a conclusion the Government does not challenge on appeal. The district court held Rodriguez-Hernandez's post-Miranda warning admission to the INS agent was voluntary and admissible, however, under Oregon v. Elstad, 470 U.S. 298, 309 (1985).

On appeal, Rodriguez-Hernandez contends her initial questioning, arrest, and detention was not supported by reasonable suspicion or probable cause, and her admission to the INS agent was "fruit of the poisonous tree." In considering the partial denial of Rodriguez-Hernandez's motion to suppress, we review the district court's factual findings for clear error and review de novo the court's legal conclusions based on those facts. United States v. Rodriguez-Arreola, 270 F.3d 611, 615 (8th Cir. 2001). We must affirm an order denying a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made. Id.

There is no question that the initial traffic stop in this case was valid. Thus, Deputy Decker could ask the driver and passengers to produce identification. Despite Rodriguez-Hernandez's response that she spoke no English, Deputy Decker did not ask her about her alienage or immigration status. Instead, the deputy asked Ayon, who first told him Rodriguez-Hernandez was here illegally, and then that she had a work permit. Although the deputy's question to Ayon about Rodriguez-Hernandez's alienage may have been outside the scope of the traffic stop, Rodriguez-Hernandez has no legitimate expectation of privacy in Ayon's knowledge that she was illegally present in the United States. Id. at 616 & n.11. Thus, she cannot contest Ayon's statements and lacks standing to assert any Fourth Amendment violation. Id. at 616. Given Ayon's statement that Rodriguez-Hernandez was not legally present in this country, Deputy Decker had reasonable suspicion to inquire into her alienage. Id. at

617.  He could detain her "to ask 'a moderate number of questions to determine [her] identity and to try to obtain information confirming or dispelling [his] suspicions.'"  Id.  Having Rodriguez-Hernandez speak with Border Patrol was within the scope of the investigatory detention aimed at confirming or dispelling what Ayon had told Deputy Decker.  See id.

Although Rodriguez-Hernandez did not receive a Miranda warning before giving her incriminatory statement to border patrol, her later admission to the INS agent should not be suppressed merely because it was the fruit of an earlier Miranda violation.  Elstad, 470 U.S. at 309; United States v. Villalba-Alvarado, 345 F.3d 1007, 1010, 1013 (8th Cir. 2003).  Instead, Rodriguez-Hernandez's post-Miranda warning statement to the INS agent need only be suppressed if it was involuntary.  Elstad, 470 U.S. at 309; Villalba-Alvarado, 345 F.3d at 1010, 1013.  Contrary to Rodriguez-Hernandez's assertion, the Supreme Court did not undermine the Elstad rule in a more recent decision, Dickerson v. United States, 530 U.S. 428, 444 (2000) (stating Miranda protections were constitutionally required).  As we noted in Villalba-Alvarado, the Court's decision in Dickerson "reaffirm[ed] the validity of Elstad by reaffirming the distinction between application of the exclusionary rule following Fourth and Fifth Amendment violations." 345 F.3d at 1012. Other circuits have adopted a similar view of Dickerson's impact on Elstad.  Id. (citing cases).  Of course, we are bound by our earlier recognitions of Elstad's ongoing validity.  Id.; Fellers, 285 F.3d at 724.

We review de novo the district court's conclusion that Rodriguez-Hernandez voluntarily confessed to the INS agent.  United States v. Fellers, 285 F.3d 721, 724 (8th Cir. 2002), cert. granted, 123 S. Ct. 1480 (2003).  To decide the voluntariness of a confession, we examine the totality of the circumstances to determine whether "'pressures exerted by the authorities overwhelmed the defendant's will.  Coercive police activity is a necessary predicate to finding that a confession is not voluntary in the constitutional sense.'"  Id. (quoting United States v. Robinson, 20 F.3d 320,

322 (8th Cir. 1994)).  The district court found there was no evidence the INS agent used coercive tactics to obtain Rodriguez-Hernandez's <u>Mirandized</u> statements more than six hours after her statements to Border Patrol.  Having carefully reviewed the record, we agree.  Because Rodriguez-Hernandez's statements to the INS agent were voluntary, they were admissible against her.

Accordingly, we affirm the district court's partial denial of Rodriguez-Hernandez's motion to suppress.

_____