*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0351p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

GILDARDO NAVARRO-DIAZ,

        *Defendant-Appellant.*

No. 04-3954

---

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 03-00018—Walter H. Rice, District Judge.

Argued: June 21, 2005,

Decided and Filed: August 18, 2005

Before: NELSON and GILMAN, Circuit Judges; DONALD, District Judge.[*]

---

**COUNSEL**

**ARGUED:** John H. Rion, RION, RION & RION, Dayton, Ohio, for Appellant. Laura I. Clemmens, ASSISTANT UNITED STATES ATTORNEY, Dayton, Ohio, for Appellee. **ON BRIEF:** John H. Rion, RION, RION & RION, Dayton, Ohio, for Appellant. Laura I. Clemmens, ASSISTANT UNITED STATES ATTORNEY, Dayton, Ohio, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Gildardo Navarro-Diaz, a citizen of Mexico, was arrested by the police when he was found in a hotel room with several other men who were armed and in possession of marijuana. After the district court denied Navarro-Diaz's motion to suppress his identity, he pled guilty to being an alien who had previously been deported and who was present in the United States without the permission of the Attorney General, in violation of 8 U.S.C. § 1326. He was sentenced to 57 months in prison.

On appeal, Navarro-Diaz argues that the district court (1) erred in denying his motion to suppress his identity, and (2) committed plain error in enhancing his sentence based upon his prior felony convictions. For the reasons set forth below, we **AFFIRM** Navarro-Diaz's conviction, but

---

[*]The Honorable Bernice B. Donald, United States District Judge for the Western District of Tennessee, sitting by designation.

**VACATE** his sentence and **REMAND** the case to the district court for resentencing in accordance with *United States v. Booker*, 125 S. Ct. 738 (2005).

## I.  BACKGROUND

In January of 2003, the police in Xenia, Ohio were called to a Holiday Inn to investigate reports that a strong odor of marijuana was emanating from one of the guest rooms.  The hotel manager told the police officers that the room in question was occupied by two African-American males, but that three Hispanic males had joined them in the room.  When the officers knocked on the door, they heard a "commotion" inside.  Five minutes passed before one of the African-American males, Leroy Swindle, opened the door.

Swindle said that the five men were "waiting for some ladies to show up."  He admitted that he had been smoking marijuana, but stated that he was the only one in the room who had been doing so.  When the officers asked him if he had any more marijuana in his possession, Swindle gave them a small bag of marijuana, containing less than half an ounce, which was then flushed down the toilet by the officers.  The five men in the room were asked to identify themselves, and all except Navarro-Diaz produced identification.  Navarro-Diaz told the officers that his name was Jose Perez, and he gave them his purported date of birth.  He also said that he had been issued an Ohio driver's license, but did not have the license with him.  When the officers entered the information provided by Navarro-Diaz into the police database, however, they discovered that no one with that name and date of birth had been issued a driver's license in Ohio.

At this point, the officers decided to release Swindle and the other African-American male without citing them for misdemeanor marijuana possession because there was only a small quantity of drugs at issue, and because the police database indicated that neither of them was wanted on an outstanding warrant.  The three remaining men, all Hispanic males, were kept in the room while the officers attempted to run a background check on Navarro-Diaz.  When the officers asked Navarro-Diaz for his name and date of birth a second time, he insisted that his name was Jose Perez, but he provided a different date of birth.  This information also did not match any known person in the police database.

The hotel manager was anxious to have the police and the remaining occupants of the room leave the premises, so the officers decided to take Navarro-Diaz and his two companions to the police station to continue the investigation.  As everyone was leaving the room, however, an officer noticed that one of the men, Juan Candelez, was hanging back and fidgeting with something in his pocket.  When asked to empty his pockets, Candelez produced the magazine to a handgun.  Candelez was immediately handcuffed and frisked, whereupon the officers discovered a loaded handgun tucked in his belt.  He was promptly arrested for possession of a concealed weapon.  A subsequent search of the room revealed a second handgun rolled up in a towel in the bathroom.

Candelez then consented to a search of his car, which was parked in the hotel lot.  In searching the car, the officers found a wallet that contained an identification card for a man who resembled Navarro-Diaz.  When the officers showed Navarro-Diaz the identification card, he finally admitted that his name was not Juan Perez, but rather Gildardo Navarro-Diaz.  The officers ran this information through their database and discovered that Navarro-Diaz had an outstanding warrant in Dayton, Ohio for failure to appear in traffic court.  Navarro-Diaz was then arrested both for providing false information to the police and on the basis of the outstanding warrant.  After he had been booked at the police station, the officers called representatives of the Immigration and Naturalization Service (now the Department of Homeland Security), who questioned Navarro-Diaz over the phone for several minutes.

Navarro-Diaz was charged in a one-count indictment with the offense of being an alien who had previously been deported and who was found to be in the United States without the permission of the Attorney General, in violation of 8 U.S.C. § 1326. He moved to suppress the evidence that was obtained from him during the questioning at the hotel—this being his identity and date of birth—because the officers had allegedly detained him without having a reasonable suspicion that he was engaged in illegal conduct.

At his suppression hearing, Navarro-Diaz admitted that he had been convicted of felony drug offenses in 1994, 1996, and 1997, and that he had been deported from the United States five times previously. In a written decision, the district court denied Navarro-Diaz's motion to suppress. Navarro-Diaz then entered a conditional guilty plea, reserving his right to appeal the denial of his motion. He was sentenced to 57 months of imprisonment. This timely appeal followed.

## II.  ANALYSIS

### A.      Standard of review

In reviewing a ruling on a motion to suppress, we will uphold a district court's factual findings unless they are clearly erroneous, but will conduct a de novo review of a district court's legal determinations. *United States v. Moncivais*, 401 F.3d 751, 754 (6th Cir. 2005). "When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc).

### B.      The district court did not err in denying Navarro-Diaz's motion to suppress his identity

Navarro-Diaz maintains that the district court erred in failing to suppress his identity because the information was obtained in violation of his Fourth Amendment rights. Specifically, Navarro-Diaz claims that the police officers at the hotel lacked reasonable suspicion to detain him, and that they learned his name and date of birth only as a result of this unlawful detention. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968) (holding that a limited search may lawfully be conducted "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous").

Navarro-Diaz's motion to suppress was denied by the district court after it found that "the only evidence which the officers obtained from the Defendant as a result of their confrontation with him on January 13, 2003, was an admission that he was Gildardo Diaz and his date of birth." The district court declined to reach the issue of whether Navarro-Diaz's detention violated the Fourth Amendment because the court concluded that *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984), precluded the suppression of Navarro-Diaz's identity regardless of whether he had been unlawfully detained.

In *Lopez-Mendoza*, the Supreme Court considered "whether an admission of unlawful presence in this country made subsequent to an allegedly unlawful arrest must be excluded as evidence in a civil deportation hearing." 468 U.S. at 1034. Refusing to suppress the alien's identity, the Court held that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Id.* at 1039.

The question in the present case—whether a defendant's name and date of birth must be suppressed when they are disclosed as a result of an allegedly unconstitutional police detention—is a matter of first impression in this circuit. Courts in the Fifth, Eighth, Ninth, and Tenth Circuits, however, have all addressed the question in cases similar to Navarro-Diaz's, where an alien had been

indicted under 8 U.S.C. § 1326. The Ninth Circuit concluded, in reliance on *Lopez-Mendoza*, "that the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity." *United States v. Del Toro Gudino*, 376 F.3d 997, 1000-01 (9th Cir. 2004) (noting the Supreme Court's "extraordinarily broad statement, using the rarely employed word 'never'"); *see also United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999) ("Even if the Defendant was illegally stopped, neither his identity nor his INS file are suppressible."). An unpublished decision from the Tenth Circuit reaches the same conclusion. *United States v. Cisneros-Cruz*, No. 98-1398, 1999 WL 444926, at *6 (10th Cir. June 30, 1999) ("The Supreme Court has held that the identity of a defendant . . . is never itself suppressible . . . .") (citing *Lopez-Mendoza*, 468 U.S. at 1039) (quotation marks omitted).

The Eighth Circuit, in contrast, initially declined to follow "the broad interpretation given *Lopez-Mendoza* by the Fifth and Ninth Circuits." *United States v. Guevara-Martinez*, 262 F.3d 751, 754 (8th Cir. 2001) (citing *Roque-Villanueva*, 175 F.3d at 346, and an earlier Ninth Circuit case). In *Guevara-Martinez*, the Eighth Circuit distinguished a criminal prosecution under 8 U.S.C. § 1326 from the civil deportation proceeding at issue in *Lopez-Mendoza* and held "that *Lopez-Mendoza* has no bearing upon the suppression of unlawfully obtained identity-related evidence in a *criminal* proceeding." 262 F.3d at 754 (emphasis added). Support for the Eighth Circuit's holding can be found in the language of *Lopez-Mendoza* itself, where the Supreme Court stressed that, in light of the "the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing." 468 U.S. at 1038 (explaining that "[a] deportation proceeding is purely a civil action to determine eligibility to remain in this country, not to punish unlawful entry").

But in two subsequent cases, the Eighth Circuit has narrowed the holding of *Guevara-Martinez*. *See United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) (concluding in dicta that the district court had erred in suppressing the alien's identity in an action under 8 U.S.C. § 1326); *United States v. Perez-Perez*, 337 F.3d 990, 993-94 (8th Cir. 2003) (affirming on other grounds the district court's denial of an alien's motion to suppress his identity in a prosecution under 8 U.S.C. § 1326). These later cases called attention to a crucial distinction between the facts before the court in *Guevara-Martinez* and the facts confronting the courts in the Fifth, Ninth, and Tenth Circuits. The defendant in *Guevara-Martinez* had moved to suppress both his identity *and his fingerprints*, which were obtained from him during his unlawful arrest. 262 F.3d at 752. And, although the district court granted his suppression motion in full, the government chose to appeal only the suppression of the fingerprint evidence. *Id.* at 753. Because "the identity-related evidence that the district court suppressed was fingerprint evidence," the Eighth Circuit felt compelled to follow established Supreme Court precedent that "applied the exclusionary rule to fingerprint evidence obtained as the result of unlawful arrests." *Id.* at 754 (citing *Davis v. Mississippi*, 394 U.S. 721 (1969), and *Hayes v. Florida*, 470 U.S. 811 (1985)).

The cases before the Fifth, Ninth, and Tenth Circuits, on the other hand, involved the suppression of only the defendant's identity. *See Del Toro Gudino*, 376 F.3d at 1001 ("Identity evidence is inherently different from other kinds of evidence . . . ."). As the Eighth Circuit noted in *Rodriguez-Arreola*, "[t]he Ninth Circuit's opinion gives no indication that it was refusing to suppress specific *physical* evidence of any sort; it only indicates that the court declined to suppress the simple fact of who the defendant was." 270 F.3d at 618 (emphasis added); *cf. United States v. Garcia-Beltran*, 389 F.3d 864, 866-67 (9th Cir. 2004) (reversing the district court's denial of a suppression motion where the defendant "did not seek to suppress the fact of his identity . . . [, but r]ather, he sought to exclude . . . [his] fingerprints"). In its later opinions, the Eighth Circuit has indicated that it would reach the same result as the Fifth, Ninth, and Tenth Circuits if confronted with a defendant who seeks to suppress only his identity. *See Perez-Perez*, 337 F.3d at 994 (observing that, when the court in *Guevara-Martinez* used the term "identity evidence," it was referring "specifically [to] fingerprints").

The conclusion that a defendant's identity cannot be suppressed comports with the decisions of other courts that have ruled on the issue outside of the immigration context. For instance, the Fourth Circuit was presented with a case where the police stopped a van without reasonable suspicion, learned the identity of the occupants of the van, and then later connected the occupants to a crime in the area. *United States v. Arias*, 678 F.2d 1202, 1203-05 (4th Cir. 1982). The defendants moved to suppress their identities, claiming "that the identity of the van's occupants would never have been discovered had the van not been stopped." *Id.* at 1206. Acknowledging that "this may be true," the court ruled that "the identity of defendants is not suppressible under the exclusionary rule." *Id.* (citing *United States v. Crews*, 445 U.S. 463 (1980)).

In *Crews*, the Supreme Court permitted a defendant to be brought to trial even though he was illegally arrested. The Court held that, although "the exclusionary sanction applies to any 'fruits' of a constitutional violation," a defendant "is not himself a suppressible 'fruit.'" *Crews*, 445 U.S. at 470, 474. Relying on *Crews*, the Second Circuit has also concluded that "the identity of defendants is not suppressible under the exclusionary rule." *United States v. Adegbite*, 846 F.2d 834, 838-39 (2d Cir. 1988) (citation omitted).

In the present case, Navarro-Diaz asks us to part ways with the other courts of appeal that have ruled on this issue and hold that a defendant's identity may be suppressed in a criminal proceeding if the identity is obtained through police conduct violative of the Fourth Amendment. Navarro-Diaz's argument is not frivolous, especially in the context of a § 1326 violation. An alien present in the United States without the Attorney General's permission, after having been previously deported, has committed a crime. 8 U.S.C. § 1326. The only evidence that the police must obtain in order for the government to prosecute someone who has committed this crime is the person's identity. Navarro-Diaz argues that if the police are free to detain and question anyone they want in order to obtain the person's identity, they may be tempted, even in the absence of reasonable suspicion, to single out people of certain ethnic backgrounds for questioning.

The Supreme Court's language in *Lopez-Mendoza*—that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest"—when taken out of context, could be read to suggest that random, widespread detentions and questioning of suspected aliens would not implicate Fourth Amendment rights. 468 U.S. at 1039. We do not believe, however, that *Lopez-Mendoza* sanctions such a result. The Supreme Court qualified its holding when it stated in the last paragraph of *Lopez-Mendoza* that "we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness." *Id.* at 1050. *But see Del Toro Gudino*, 376 F.3d at 999, 1001 (stating in dicta that the identity of a defendant who was "stopped merely because of ethnicity" could not be suppressed because the Supreme Court's qualification applied to another, unrelated portion of its *Lopez-Mendoza* opinion, as evidenced by the fact that "the line of cases cited by the Court in support of its identity holding involved fact patterns that most likely would have constituted 'egregious' violations of the defendants' rights").

Like the defendant in *Lopez-Mendoza*, Navarro-Diaz was not the victim of an "egregious violation[] of the Fourth Amendment." 468 U.S. at 1050. Although the district court in the present case made no finding with respect to whether the police had reasonable suspicion to detain Navarro-Diaz, the record reveals that he was not accosted by the police in a random attempt to determine whether he was an illegal alien. His encounter with law enforcement was precipitated by his being present in a hotel room in the middle of the day with four other local men, at least one of whom was smoking marijuana. All of the men in the room, not just the Hispanic men, were asked to identify themselves. Navarro-Diaz did so by providing the police with a false name, and then one of his companions was found to be in possession of a loaded handgun. A search of the hotel room led to the discovery of another gun in the bathroom. Under these circumstances, the police officers

decision to detain Navarro-Diaz until he provided his real name can hardly be said to have "transgress[ed] notions of fundamental fairness." *Id.* at 1050.

Moreover, there is a significant practical problem with Navarro-Diaz's argument. Navarro-Diaz "is a person whose unregistered presence in this country, without more, constitutes a crime. His release within our borders would immediately subject him to criminal penalties." *See Lopez-Mendoza*, 468 U.S. at 1047. If his "identity may be suppressed, the moment the court lets him go, he is immediately committing the continuing violation of being present in the United States after having been deported." *Del Toro Gudino*, 376 F.3d at 1001-02 ("Although the rule that identity evidence is not suppressible is not limited to § 1326 cases, its practical force is particularly great in this context."). The Supreme Court recognized this difficulty in *Lopez-Mendoza*, when it refused to suppress the alien's identity because, although "[t]he constable's blunder may allow the criminal to go free, . . . [the Court has] never suggested that it allows the criminal to continue the commission of an ongoing crime." 468 U.S. at 1047 ("Even the objective of deterring Fourth Amendment violations should not require such a result.").

Directing the district court to grant Navarro-Diaz's suppression motion, therefore, would not affect the ultimate outcome of the charge against him. If the government were forced to drop its prosecution of Navarro-Diaz, the police could simply approach him on his way out of the courtroom door and demand that he identity himself. *See Hiibel v. Sixth Judicial Dist.*, 124 S. Ct. 2451, 2458 (2004) (stating that, so long as reasonable suspicion exists, "a police officer is free to ask a person for identification without implicating the Fourth Amendment"); *see also INS v. Delgado*, 466 U.S. 210, 212 (1984) (holding that "the individual questioning of the [defendants] by INS agents concerning their citizenship did not amount to a detention or seizure under the Fourth Amendment"). Should Navarro-Diaz refuse to answer, he could be arrested under a state "stop-and-identify" statute, and his identity could then be discovered during the course of the normal booking procedure. *See Hiibel*, 124 S. Ct. at 2459 ("A state law requiring a suspect to disclose his name [or else face arrest] . . . is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures.").

Because Navarro-Diaz could simply be reindicted for the same offense, suppressing his identity would have little deterrent effect upon the police who questioned him during his allegedly unlawful detention. *See United States v. Rodriguez-Arreola*, 270 F.3d 611, 619 (8th Cir. 2001) (stating that the suppression of fingerprint evidence taken during an unlawful arrest would not "bar the present or future prosecution of [the defendant] under § 1326"). We therefore conclude that the Supreme Court's holding in *Lopez-Mendoza* mandates that Navarro-Diaz's motion to suppress his identity be denied, regardless of whether this information was obtained in violation of his Fourth Amendment rights.

C.      **The district court committed plain error in sentencing Navarro-Diaz under the then-mandatory Sentencing Guidelines**

Navarro-Diaz also argues that the district court committed plain error in enhancing his sentence based upon his three prior felony-drug convictions, and he asks that his case be remanded to the district court for resentencing in light of *United States v. Booker*, 125 S. Ct. 738, 749 (2005). Prior to the enhancement, Navarro-Diaz's sentencing range was determined to be 4 to 10 months of imprisonment. But after the district court's 16-level enhancement based upon his prior criminal convictions, Navarro-Diaz's sentencing range jumped to between 57 and 71 months. The district court sentenced him to 57 months, the lowest end of the enhanced range.

In sentencing Navarro-Diaz, the district court hinted that it might have imposed a sentence that was shorter than the minimum if such a sentence were allowed under the Sentencing Guidelines. The court justified its decision to sentence Navarro-Diaz at the low end of the enhanced range because cases "involving defendants who will be deported result, in effect, in harsher time because

they are not eligible for halfway house placement . . . . So this defendant will be serving six months longer in an institution than someone who is an American citizen."

Navarro-Diaz's sentencing enhancement was based solely on his prior criminal convictions. "*Booker*'s holding, that the Sixth Amendment bars mandatory enhancements based on judicial fact-finding, does not apply to the fact of a prior criminal conviction." *United States v. Poole*, 407 F.3d 767, 777 (6th Cir. 2005) (quotation marks omitted); *cf. Booker*, 125 S. Ct. at 756 ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.").

Regardless, Navarro-Diaz was sentenced under the then-mandatory Sentencing Guidelines. "[E]ven absent a Sixth Amendment violation, this Court has decided that a defendant sentenced under the mandatory Guidelines regime is entitled to a remand for resentencing under the now-advisory Guidelines unless there is evidence in the record to rebut the presumption of prejudice." *United States v. Alva*, 405 F.3d 383, 385 (6th Cir. 2005). There is no evidence in the present case to rebut the presumption. In fact, there is affirmative evidence in the record that suggests that the district court might well have shortened Navarro-Diaz's sentence if it had had the discretion to do so. We therefore conclude that this case must be remanded for resentencing under the now-advisory Sentencing Guidelines. *See United States v. Barnett*, 398 F.3d 516, 530-31 (6th Cir. 2005) (remanding for resentencing where the defendant was sentenced under the mandatory Guidelines regime).

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** Navarro-Diaz's conviction, but **VACATE** his sentence and **REMAND** the case to the district court for resentencing in light of *Booker*.