# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3755

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Raul Jiminez, | * | District of Nebraska. |
| | * | |
| Appellant. | * | |
| | * | |
| | * | |

_____

Submitted: February 12, 2007
Filed: May 16, 2007

_____

Before LOKEN, Chief Judge, O'CONNOR[*], Associate Justice (Ret.), and GRUENDER, Circuit Judge.

_____

O'CONNOR, Associate Justice (Ret).

A jury convicted Raul Jiminez of conspiracy to distribute and to possess with intent to distribute more than 500 grams of methamphetamine. Jiminez challenges the proceedings below on two grounds. First, Jiminez contends that the district court

_____

[*] The Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

improperly allowed certain evidence to be introduced which was unfairly prejudicial. Second, Jiminez contends that there was insufficient evidence to support his conviction. Because the district court did not abuse its discretion in the contested evidentiary rulings and a reasonable jury could have found Jiminez guilty beyond a reasonable doubt, we affirm the judgment of the district court.

I.

Using a federal wiretap to intercept phone calls, law enforcement officials learned of a drug shipment that was to be delivered to Norfolk, Nebraska. On the morning of March 3, 2005, a Nebraska State Patrol official informed Trooper Timothy Stopak of suspicions that a shipment of methamphetamine was being transported in a green Plymouth minivan, with the Minnesota license plate number NHB030, traveling north on Highway 81 toward Norfolk, Nebraska. Later that morning, Trooper Stopak saw the green minivan and pulled the vehicle over for speeding.

Trooper Stopak approached the vehicle and asked Jiminez, who was the only occupant of the minivan, for his driver's license, registration, and proof of insurance. As Jiminez handed over some of the materials, Trooper Stopak observed that Jiminez's hand was shaking. When Trooper Stopak inquired about Jiminez's destination, he responded that he was driving to Norfolk, where he had family.

Trooper Stopak requested that Jiminez accompany him back to his police cruiser. Once they were in the cruiser, Trooper Stopak asked Jiminez where he began his trip. Jiminez did not answer the question. Indeed, despite being asked numerous times where he started his trip, Jiminez never answered the question. When Trooper Stopak asked who owned the minivan, Jiminez initially answered that his friend owned the vehicle, but subsequently said that it was owned by his wife's cousin. In addition, Jiminez claimed that he had recently won money at a casino.

Trooper Stopak filled out a form authorizing a search of the minivan and read it to Jiminez, who signed the form. Trooper Stopak requested and received help from other officers in conducting the search of the minivan. The officers discovered that the minivan had a hidden compartment beneath a false floor. That compartment contained approximately 9.8 pounds of methamphetamine, whose value was estimated as somewhere between $80,000 and $120,000. In addition to the illicit drugs, the officers seized: a cell phone; a driver's license issued to a person named Cesar Cruz Salas that was found in Jiminez's wallet; a boarding pass for a February 8-9, 2005 flight from San Diego to Minneapolis; and a paper napkin, on which was written "Paulo," a phone number, and "Norfolk." When Jiminez was arrested for transporting methamphetamine, Trooper Stopak noted that he appeared dejected rather than surprised or angry. An in-car camera recorded the traffic stop, a video of which was played for the jury during the trial.

On March 24, 2005, a grand jury indicted Jiminez (along with five codefendants) for a charge of conspiracy to distribute and to possess with intent to distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. § 846. Following Jiminez's first trial, the jury could not reach a verdict and the district court judge declared a hung jury.

Before he was retried, Jiminez filed, among other evidentiary motions, a motion seeking to exclude his cell phone records. The district court granted Jiminez's motion because of a delay in the government's production of the records. The district court did, however, leave open the possibility that the cell phone records could be admitted for the purpose of rebuttal.

At the retrial, a witness named Mollie Moler testified as part of a plea agreement. Moler testified that she had both used drugs with and made deliveries for Pablo Landin, whom she knew through Jesus Padilla. Not long before the events in question, Landin instructed Moler and another woman to purchase plastic bags and

tape in preparation for repackaging a drug shipment that he was expecting. Because the vehicle containing the drug shipment did not arrive as anticipated, Landin told the two women to go out in a car looking for a vehicle with Minnesota plates, which contained the methamphetamine. After the drugs had still not arrived, Moler testified that Landin speculated that the courier may have stolen the drugs.

Drew Armstrong, a special agent of the Federal Bureau of Investigation, testified at trial about the wiretap that uncovered the planned drug shipment to Norfolk. On February 28, 2005, law enforcement officials learned of this Norfolk shipment from an intercepted telephone call between Landin's cell phone and a person known as "Lupe." Landin's cell phone number was the same number as the one on the napkin that police retrieved from the minivan that Jiminez was driving. Agent Armstrong suggested that the name written on the napkin ("Paulo") referred to Landin, whose first name is actually "Pablo."

On the evening of March 2, 2005, officials intercepted another phone call between Landin and Lupe. Lupe gave Landin a ten-digit phone number, which turned out to be the number for the phone that officers retrieved from the minivan. Lupe further informed Landin that "the man's name is Raul" and that he had just given Landin's phone number to Raul so that they could communicate directly. While the telephone conversations between Lupe and Jiminez were not intercepted because neither of their phones was tapped, the records for Jiminez's cell phone reveal three phone calls from Jiminez to a number for Lupe on March 2, 2005.

Around midnight on March 2, 2005, officials intercepted two phone calls between Jiminez and Landin. In the first phone call, Jiminez said that he was "calling on behalf of Lupe" and received driving directions to Norfolk from Landin. In the second phone call, Landin instructed Jiminez to spend the night in York, Nebraska because the roads were "pretty deserted." Landin stated: "You rest there in York and – and that way you – you leave at the – the time people leave for work. At six." This

second intercepted phone call spurred law enforcement officials to identify vehicles in York's hotel parking lots that might contain the drug shipment. One of the potential drug shipment vehicles that the officials identified was the minivan driven by Jiminez. In the morning, Jiminez and Landin spoke on numerous occasions, during which Landin offered Jiminez directions to Norfolk in general and to his house in particular.

In addition to his testimony about the intercepted phone calls, Agent Armstrong testified about drug trafficking practices more broadly. Agent Armstrong explained that drug traffickers often use code words to avoid detection when discussing drugs. Drug traffickers also often use many cell phones, Agent Armstrong explained, because the larger the number of cell phones, the more difficult it is for law enforcement officials to monitor the phone calls. With the changes that have occurred in air travel since the terrorist attacks of September 11, 2001, Agent Armstrong testified that he has noticed that drug shipments are now often transported via motor vehicle. Agent Armstrong further noted that minivans are popular vehicles for drug transportation because they have many places where packages can be concealed.

Agent Armstrong offered testimony suggesting that Jiminez's role in the drug trafficking scheme was not that of an innocent person. Examining Jiminez's responses to Trooper Stopak, Agent Armstrong noted that Jiminez offered two different answers as to who owned the minivan. In addition, Agent Armstrong noted that Jiminez refused to answer Trooper Stopak's question about where he began his trip. Finally, Agent Armstrong also testified that two items found on Jiminez when he was arrested were consistent with those of a drug trafficker: (1) Jiminez possessed a driver's license issued to another person; (2) Jiminez had a one-way airline ticket stub that had not been purchased in advance from San Diego to Minneapolis. Agent Armstrong suggested that this unusual ticket purchase would be consistent with a trip for the purpose of drug trafficking.

During cross-examination, defense counsel asked Agent Armstrong questions about intercepted phone calls involving Jiminez. In doing so, defense counsel elicited testimony from Agent Armstrong suggesting that there were only three phone calls among the co-conspirators to which Jiminez was a party. The number of calls involving Jiminez was, in fact, substantially larger. The government requested that the district court reconsider its exclusion of Jiminez's cell phone records because of the misimpression that the cross-examination of Agent Armstrong had created. The district court subsequently deemed the records relevant and admissible to correct this misimpression.

On May 11, 2006, the jury returned a guilty verdict. The district court sentenced Jiminez to 144 months of imprisonment, which was to be followed by 5 years of supervised release. This appeal followed.

## II.

On appeal, Jiminez makes two distinct arguments. First, Jiminez contends that the district court erred in admitting certain documents into evidence because those materials were unfairly prejudicial. Second, Jiminez contends that there was insufficient evidence supporting his conviction for conspiracy to distribute and to possess with intent to distribute methamphetamine. We address each of Jiminez's arguments in turn.

## A.

Jiminez argues that the district court erred when it admitted into evidence the driver's license issued to Cesar Cruz Salas, the one-way airline ticket stub from San Diego to Minneapolis, and his cell phone records. These documents, Jiminez suggests, should have been excluded under Rule 403 of the Federal Rules of Evidence, which provides in relevant part: "Although relevant, evidence may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice . . . . " Fed. R. Evid. 403. We disagree.

In assessing a district court's evidentiary rulings, we review for an abuse of discretion. *See United States v. Guerrero-Cortez*, 110 F.3d 647, 652 (8th Cir. 1997). "The trial court has broad discretion in determining the relevancy and admissibility of evidence." *United States v. Wallace*, 722 F.2d 415, 416 (8th Cir. 1983). Under Rule 403, "great deference" is given to a district court's balancing of the relative value of a piece of evidence and its prejudicial effect. *United States v. Lupino*, 301 F.3d 642, 646 (8th Cir. 2002); *Wallace*, 722 F.2d at 416.

In order to fall within the Rule 403 exception to relevant evidence, the evidence must be "unfair[ly] prejudic[ial]." Fed. R. Evid. 403. *See Wade v. Haynes*, 663 F.2d 778, 783 (8th Cir. 1981) (recognizing that Rule 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis."); *United States v. Gloster*, 185 F.3d 910, 914 (D.C. Cir. 1999) (noting that "Rule 403 focuses not on prejudice but on the danger of unfair prejudice") (internal quotation marks omitted). The United States Supreme Court has noted that unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). As the advisory committee's notes accompanying Rule 403 explain: "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's notes.

While the driver's license issued to Salas was surely prejudicial to Jiminez's defense, we cannot conclude that permitting these materials to be introduced was *unfairly* prejudicial to his case. The district court admitted the driver's license that

was issued to Salas because drug traffickers often carry another person's identification to conceal their identity. That is a reasonable basis for admitting the identification, which was found in Jiminez's billfold, into evidence. Thus, permitting Salas's identification to be introduced strikes us as more probative than prejudicial.

The district court also did not err in admitting into evidence the one-way airline ticket stub from San Diego to Minneapolis. First, we think that it is significant that, as the district court noted, Jiminez had the contested boarding pass on his person when he was arrested. Second, although Jiminez does not expressly challenge Agent Armstrong's testimony, we note that a district court "has discretion to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers . . . in areas concerning activities which are not something with which most jurors are familiar." *United States v. Boykin*, 986 F2d 270 (8th Cir. 1993) (internal quotation marks omitted). Agent Armstrong's testimony regarding the usage of one-way airline tickets (not purchased in advance) can be understood as placing the activities of drug traffickers into context for jurors who may be unfamiliar with the folkways of drug trafficking. Finally, we note that the Federal Rules of Evidence generally favor the admission, rather than the exclusion, of evidence. *See Anderson v. Malloy*, 700 F.2d 1208, 1211 & n.4 (8th Cir. 1983). The district court adhered to this principle in permitting the ticket stub to be introduced into evidence, and allowing jurors to draw their own conclusions about its significance.

Turning to the introduction of Jiminez's cell phone records, the district court initially decided to exclude Jiminez's cell phone records in light of the delayed timing of production. Those records were not excluded because they were irrelevant or because they were somehow unfairly prejudicial to Jiminez. Where evidence is initially deemed inadmissible, this Court has previously determined that defense counsel's questions can render the excluded evidence admissible. *See United States v. Beason*, 220 F.3d 964, 968 (8th Cir. 2000) ("We have allowed the use of otherwise inadmissible evidence to clarify or rebut an issue opened up by defense counsel on

cross-examination."); *United States v. Womochil*, 778 F.2d 1311, 1315 (8th Cir. 1985). Here, when the district court initially granted the motion in limine excluding Jiminez's cell phone records, it explicitly noted that the records could nonetheless potentially become admissible for rebuttal. That potential was realized when defense counsel's cross-examination of Agent Armstrong gave the misimpression that Jiminez was a party to only three phone calls with co-conspirators. It was not unfairly prejudicial for the jury to know that Jiminez spoke to Lupe and to Landin on multiple occasions. Given the broad deference that we accord district courts' evidentiary determinations, we cannot find that the district court abused its discretion.

B.

We now consider whether there was sufficient evidence to support the jury's verdict convicting Jiminez of conspiracy to distribute illicit drugs. "In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences (drawn from the evidence) supporting the verdict." *United States v. Bustos-Torres*, 396 F.3d 935, 946 (8th Cir. 2005). This standard of review "is very strict, and the verdict of the jury should not be overturned lightly." *United States v. Espino*, 317 F.3d 788, 791 (8th Cir. 2003) (internal quotation marks omitted). We affirm the conviction below, in short, if a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *See Bustos-Torres*, 396 F.3d at 946.

"To establish that a defendant conspired to distribute drugs under 21 U.S.C. § 846, the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *Espino*, 317 F.3d at 792. The government does not need to demonstrate, however, proof of an express agreement among co-conspirators. *See United States v. Cabrera*, 116 F.3d 1243, 1244 (8th Cir. 1997). Instead, "the government need only establish a tacit understanding between the

parties, and this may be shown wholly through the circumstantial evidence of [the defendant's] actions." *Id.* at 1245 (internal quotation marks omitted). "[B]ecause the nature of conspiracy entails secrecy, the agreement and members' participation in [the conspiracy] must often be established by way of inference from the surrounding circumstances." *Id.* (internal quotation marks omitted). After a conspiracy has been established, "the government must offer enough evidence to prove a defendant's connection to a conspiracy beyond a reasonable doubt before a conspiracy conviction can be upheld." *United States v. Lopez*, 443 F.3d 1026, 1028 (8th Cir.2006) (en banc).

Jiminez wisely does not contest that a drug conspiracy in fact existed. Rather, Jiminez asserts that he lacked the requisite knowledge and intent because he was unaware that the minivan he was driving contained methamphetamine. This argument is unpersuasive.

Several aspects of Jiminez's interaction with Trooper Stopak suggest that he knew that the minivan contained drugs. First, Trooper Stopak described Jiminez's hand as trembling when Jiminez handed him documents. While a certain amount of nervousness is a part of most traffic stops, the jury could have reasonably concluded that Jiminez's behavior betrayed knowledge of the methamphetamine. *See United States v. Barajas*, 474 F.3d 1023, 1026 (8th Cir. 2007) ("The jury heard testimony that [the defendant] was exceptionally nervous at the traffic stop, a fact that the jury could reasonably interpret as suggesting a consciousness of guilt."). Second, Jiminez made a number of inconsistent statements to Trooper Stopak suggesting that he had something to hide. For instance, although Jiminez told Trooper Stopak that he was heading to Norfolk to visit family, when Jiminez initially called Landin he said that he was "calling on behalf of Lupe." In addition, although Jiminez at first said that the minivan belonged to a friend, he later stated that it belonged to his wife's cousin. Jiminez's inconsistent statements to Trooper Stopak, particularly when combined with his nervous behavior, suggest that Jiminez may have had knowledge of the minivan's contents. *See United States v. Martinez*, 168 F.3d 1043, 1048 (8th Cir. 1999) (holding

–10–

that a "jury could have found that [the defendant's] apparent nervousness and his inconsistent answers were related to his knowledge that there were drugs in the vehicle"). Third, the jury could have regarded Jiminez's refusal to answer Trooper Stopak's repeated inquiries regarding where Jiminez was coming from as evidence of guilt.

Moreover, two statements made by Landin, the person to whom Jiminez was delivering the methamphetamine, undermine the idea that Jiminez was merely a dupe in the conspiracy. First, Landin told Jiminez to stay overnight in York not because he was tired, but because the roads were deserted. Most motorists attempt to avoid rush hour traffic if it is possible, but Landin explicitly instructed Jiminez to wait for it. Jiminez's unquestioning acceptance of this instruction could be interpreted to suggest that he understood the true purpose of the trip to Norfolk. *See United States v. Thropay*, 394 F.3d 1004, 1006 (8th Cir. 2005) ("The jury reasonably could have found that . . . [the defendant] avoided Interstate 10 to reduce the chances that he would be pulled over and found with the cocaine."). Second, Moler testified at trial that Landin expressed fear that Jiminez may have stolen the methamphetamine. Such a fear would seem highly unusual if Jiminez were in fact unaware of the minivan's stash.

Jiminez attempts to demonstrate that he lacked knowledge of the methamphetamine that he was transporting by noting, among other things, that he: (1) "did not try to avoid the stop"; (2) "pulled over as soon as the trooper's lights turned on"; (3) "was forthcoming that he was not driving his own vehicle"; and (4) "[s]ign[ed] the permission to search." Appellant's Br. at 11-12. With respect to the first three reasons, Jiminez could have thought that Officer Stopak was pulling him over solely to issue a speeding violation. If that were the case, it would certainly have been in Jiminez's interest to comply with the police officer, so that he could continue making his way to Norfolk. As to the fourth reason, permitting a police officer to conduct a search does not, of course, necessarily evidence an innocent state of mind.

Jiminez contends that Agent Armstrong's testimony offers further support for the assertion that he did not know that the minivan contained drugs. Here, Jiminez notes that Agent Armstrong's testimony reveals that Jiminez repeatedly got lost on his way to Norfolk, that he did not leave the hotel until approximately 7:43 a.m. (not 6 a.m., as he was instructed), and that he "stopped at a casino," which he notes is "[n]ot a wise move for someone transporting drugs." Appellant's Br. at 13. Jiminez, in effect, asks us to confuse ineptitude with innocence. We decline to do so.

Finally, Jiminez urges us to find that there was insufficient evidence to convict him because the seized methamphetamine was not dusted for fingerprints. *See* Appellant's Br. at 14. Jiminez thinks that this is important because "such evidence could have tied [him] directly to the drugs, or exonerated him." *Id.* This argument is wholly unpersuasive. In order to be a conspirator in a drug distribution operation, it is not necessary to physically handle drugs. An absence of Jiminez's fingerprints on the methamphetamine would not undermine the jury's conclusion that he was the courier in the conspiracy.

We conclude that the government presented more than sufficient evidence to support Jiminez's conviction.

For the foregoing reasons, the judgment of the district court is affirmed.

—————————————