# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-3259

_____

United States of America

*Plaintiff - Appellee*

v.

Bobbie H. Keys

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: June 13, 2013
Filed: July 18, 2013

_____

Before COLLOTON, GRUENDER, and BENTON, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Bobbie Keys was convicted by a jury of conspiracy to distribute 280 grams or more of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. He appeals the district court's[1] denial of his motion to suppress and request for a *Franks*

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, adopting the report and recommendations of the Honorable Cheryl R.

hearing, his motion for judgment of acquittal based on sufficiency of the evidence, and his motions to exclude testimony based on alleged *Brady* violations. For the reasons discussed below, we affirm.

## I. Background

In the summer of 2009, detectives with the Lincoln, Nebraska police department were investigating the distribution of large quantities of cocaine and crack cocaine in Lincoln. A prospective cooperating source, Zachari Kilcoin, indicated during a proffer interview that an individual named Bobbie Keys, whom Kilcoin guessed to be twenty-five or twenty-six years of age, was a major source of the crack cocaine that was reaching Lincoln. Kilcoin claimed that he had driven to Keys's residence near the intersection of 7th and Georgia streets in Kansas City, Kansas approximately seventeen times since 2006, sometimes by himself and sometimes with a second individual, Michael Mitchell, purchasing from four to twelve ounces of crack cocaine from Keys each time. Kilcoin also claimed to have seen additional amounts of crack cocaine at Keys's residence on each occasion, sometimes as much as a kilogram, and to have seen Keys sell crack cocaine to other individuals.

The Lincoln detectives forwarded this information to detectives with the Kansas City police department. The Kansas City detectives identified a twenty-eight-year-old resident of Kansas City named Bobbie Keys and returned a photograph of him to the Lincoln detectives. At a follow-up interview, Kilcoin identified Keys's photograph from a stack of photographs presented by the Lincoln detectives. When asked to provide a further description of Keys's residence, Kilcoin stated that Keys drove a blue Pontiac Firebird and that his residence was identifiable by a stairwell leading from a porch to the driveway area.

Zwart, United States Magistrate Judge for the District of Nebraska, with respect to the motion for a *Franks* hearing and motion to suppress.

The Lincoln detectives next interviewed Mitchell, whom Kilcoin had identified as accompanying him on several trips to Keys's residence. Mitchell, who became a second cooperating source, corroborated many of the details offered by Kilcoin regarding their trips to Kansas City to purchase crack cocaine. Mitchell described the location of the residence where the transactions occurred as near Quindaro Boulevard. Although Mitchell knew the seller at that residence only by the name "Chicken," he identified the photograph of Keys as "Chicken."

On October 20, 2009, the detectives arranged for Kilcoin to place a recorded telephone call to Keys. A portion of their conversation was as follows:

> Kilcoin: I'm scraping some shit up now, so in a few—like a day or so or something, I can probably come touch you.
>
> Keys: All right. Bet. Let me know what's up.
>
> Kilcoin: Hey, you going to have the four way for me?
>
> Keys: Yeah.
>
> * * *
>
> Kilcoin: All right. Well, shit, I'm about to touch you—I'm about to touch you, like, tomorrow or the next day when I get everything together, nig, and then I'll pull up on you.
>
> Keys: All right. Bet.

Kilcoin characterized this exchange to the detectives as Kilcoin informing Keys that he was attempting to get together sufficient funds to buy four ounces of crack cocaine, and Keys agreeing that Kilcoin could visit him and that Keys would be able to sell him four ounces of crack cocaine. Also on October 20, 2009, using a satellite and street view image database, Kilcoin was able to direct the detectives to the

-3-

precise location of Keys's residence, which the detectives identified as 2701 North Early Street.

On November 11, 2009, Kansas City detectives confirmed that Keys listed the 2701 North Early address on his driver's license, had cited that address as his residence to police after an arrest earlier that summer, and was currently the primary account holder for utilities at that address. Surveillance revealed that Keys was present at the residence and that a blue Pontiac Firebird was parked in the driveway. That afternoon, Kilcoin placed another recorded telephone call to Keys, and a portion of that conversation was as follows:

> Kilcoin: . . . Well, just have—just do the four because that's all I got enough bread for is just four of them, so . . .
>
> Keys: Okay. All right.
>
> * * *
>
> Keys: All right. [W]ell, like, when you coming? Tomorrow or today or what?
>
> Kilcoin: No, tomorrow. I ain't coming today.
>
> * * *
>
> Keys: Just hit me when you're on your way?
>
> Kilcoin: Yep.
>
> Keys: All right. Bet.
>
> Kilcoin: All right. So, yeah what do you want for the four of them?
>
> Keys: Uhhh. . . .

* * *

Kilcoin:  I got 4,000, man, so . . .

Keys:  Okay.  Yeah, I think I—I can squeeze them in for that.

Kilcoin:  All right.  Cool.

Keys:  All right.  Bet.

Kilcoin placed a final recorded telephone call to Keys the next day, and a portion of that conversation was as follows:

Kilcoin:  . . . [J]ust on the freeway about—about, like—oh, shit, I'd say about 50 miles away.

Keys:  All right.  Bet.  Okay.

Kilcoin:  You got that shit there, man . . .?

* * *

Kilcoin:  You—you got it there with you?

Keys:  Yeah.  I was just waiting until you got close, and you already know I packed it up.

After that call, Kansas City detective Eric Jones summarized the events above in an application to the Kansas state court in Wyandotte County for a search warrant for the 2701 North Early residence.  In his affidavit in support, Jones described the recorded telephone calls as follows:

On October 20, 2009 CS1 [Kilcoin, cooperating source #1] made a recorded phone call to KEYS.  CS1 advised that CS1 was trying to get

-5-

some money together and wanted to buy some "crack" from KEYS. KEYS said that CS1 could come down and confirmed that he could sell CS1 four ounces.

* * *

At 1:10 p.m. [on November 11, 2009], Detectives utilized CS1 to make a controlled phone call to KEYS. CS1 informed KEYS that he needed 4 ounces of "crack" cocaine and would be down "tomorrow". . . .

On November 12, 2009 at 12:22 pm CS1 called KEYS about the drug transaction. CS1 asked, "hey do you have that shit with you?" KEYS responded, "yeah, I was waiting for you to get close, you know I already picked [sic] it up.["]

The search warrant issued, and detectives executed the search at 2701 North Early Street about ninety minutes after the final telephone call. The search uncovered a set of scales and a Pyrex measuring cup each coated with crack cocaine residue, plastic sandwich baggies with missing corners, a razor blade, and a bottle of Inositol. Apart from the residue, however, no crack cocaine was discovered.

Keys was charged with conspiracy to distribute 280 grams or more of crack cocaine. He moved to suppress the evidence obtained from the search warrant and requested a *Franks* hearing, alleging that the affidavit contained false statements because it characterized the recorded telephone calls as including the term "crack," yet the term "crack" never was expressly mentioned in any of the recorded telephone calls. The district court denied the motion without a hearing, and the case proceeded to a jury trial.

The Government's witnesses included Kilcoin, Mitchell, and several other individuals who testified that they occasionally accompanied one or both of Kilcoin and Mitchell to Keys's house and observed Keys engage in various aspects of crack cocaine trafficking. Keys objected to the admission of testimony from three

-6-

witnesses because it contained "new" information that was not disclosed by the Government prior to trial. Kilcoin's girlfriend, Anisha Evans, and his mother, Lynda Schaaf, each were expected to testify merely about accompanying Kilcoin and Mitchell on some of their trips to Keys's residence. However, Evans also testified that she independently had purchased crack cocaine from Keys, and Schaaf testified that she had observed a scale on the kitchen counter in the residence. In addition, Mitchell disclosed for the first time that he had seen additional individuals buying crack cocaine at Keys's residence. The Government stated that the challenged testimony was "new" to the Government as well and that it was not disclosed in any reports or statements from the respective witnesses. The district court allowed the testimony and instructed Keys that he was free to cross-examine the witnesses on their failure to disclose the information during previous interviews.

At the close of the Government's evidence, Keys moved for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court denied the motion. As part of the defense's evidence, Keys testified that, although he made personal use of crack cocaine, he never distributed it. Keys also testified that the recorded telephone conversations were a discussion of a potential transaction between himself and Kilcoin involving a vehicle and four tire rims, rather than crack cocaine. At the close of evidence, Keys renewed his Rule 29 motion, which again was denied. The jury returned a verdict of guilty, and the district court sentenced Keys to 121 months' imprisonment. On appeal, Keys challenges the denial of his request for a *Franks* hearing and motion to suppress and the denial of his Rule 29 motion for acquittal. He also alleges that the introduction of "new" testimony by Evans, Schaaf, and Mitchell constitutes a *Brady* violation necessitating a new trial.

## II. Discussion

### A. Motion to Suppress and Request for *Franks* Hearing

Keys contends that the search warrant was obtained through the use of false statements in the supporting affidavit and that the district court should have granted a hearing to investigate the issue under *Franks v. Delaware*, 438 U.S. 154 (1978). Keys's argument turns on the use of the term "crack," in quotation marks, in the affidavit description of the recorded telephone calls. Because the transcripts of the calls indicate that the term "crack" was never audibly used in the conversations,[2] Keys argues that the inclusion of the term in quotation marks in the affidavit was intended to mislead the issuing court into believing that the recorded conversations contained express references to a drug transaction, masking innocent alternative interpretations of the conversations. The Government counters that the term "crack" was placed in quotation marks throughout the affidavit, rather than solely in the sections describing the telephone calls, and that the quotation marks were used merely to designate that the term "crack" is "a slang, common or short form for a controlled substance, cocaine base."

"We review the denial of a request for a *Franks* hearing for abuse of discretion." *United States v. Crissler*, 539 F.3d 831, 833 (8th Cir. 2008) (quoting *United States v. Jansen*, 470 F.3d 762, 766 (8th Cir. 2006)). "In order to obtain a *Franks* hearing, a defendant must make a substantial preliminary showing of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the finding of probable cause." *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002). "The type of showing required is not easily met." *Id.*

---

[2]The district court left open the possibility that the term "crack" may have been used in the recorded conversations because some segments of the recordings contain indiscernible words.

In this case, we need not resolve the dispute as to why the term "crack" was placed in quotation marks in the affidavit. We agree with the district court that, even absent the challenged references to "crack" and a "drug transaction" in the telephone call descriptions, the affidavit is sufficient to establish probable cause. "[T]he existence of probable cause depends on whether, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)). Where probable cause depends upon information supplied by an informant, "[t]he core question . . . is whether the information is reliable." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). "Information may be sufficiently reliable to support a probable cause finding if . . . it is corroborated by independent evidence." *Id.* "If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Id.*

Here, according to the affidavit, two cooperating sources identified Keys as supplying crack cocaine to them on multiple occasions. The first source identified Keys by both name and photograph, the second source identified him by photograph, and both sources identified the neighborhood where the crack cocaine transactions occurred. Although neither source had a prior history of providing information to law enforcement, the receipt of consistent information from two separate sources is a form of corroboration. *See, e.g.*, *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990) (holding that two anonymous "tips were mutually corroborative"). Moreover, detectives independently verified that a blue Pontiac Firebird was parked in the driveway and that Keys resided at 2701 North Early, as detailed by one of the sources. "[I]t is well established that even the corroboration of minor, innocent details can suffice to establish probable cause." *Rodriguez*, 711 F.3d at 936 (quoting *Solomon*, 432 F.3d at 828). Even after the references to "crack" and a "drug

-9-

transaction" are excised from the affidavit's description of the recorded telephone calls, it would be more than reasonable to conclude that the "shit" discussed as the object of a new transaction in those calls was crack cocaine. Thus, given "the totality of the circumstances, there [was] a fair probability that contraband or evidence of a crime [would] be found" at 2701 North Early. *Id.* (quoting *Solomon*, 432 F.3d at 827).

Because Keys cannot "show that the alleged false statement . . . was necessary to the finding of probable cause," *Gabrio*, 295 F.3d at 883, the district court did not abuse its discretion in denying the request for a *Franks* hearing and denying the motion to suppress.

**B.      Sufficiency of the Evidence**

In reviewing the denial of a Rule 29 motion for judgment of acquittal, "[w]e review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. May*, 476 F.3d 638, 640-41 (8th Cir. 2007) (quoting *United States v. Washington*, 318 F.3d 845, 852 (8th Cir. 2003)). "We may reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* at 641 (quoting *Washington*, 318 F.3d at 852). The elements of a conspiracy to distribute a controlled substance under 21 U.S.C. § 846 are "(1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007) (quoting *United States v. Espino*, 317 F.3d 788, 792 (8th Cir. 2003)).

Keys first contends that, because the evidence of his involvement is limited to his actions in Kansas City, Kansas, there is no evidence that he knowingly

participated in a conspiracy to distribute crack cocaine in Nebraska, as alleged in the indictment. This argument is not well taken, as the indictment refers to a conspiracy "in the District of Nebraska *and elsewhere*" (emphasis added). Moreover, even if the indictment referred solely to Nebraska, where the investigation into the conspiracy began, Keys cites no authority for the proposition that every location in which the conspiracy operates must be listed in the indictment. *Cf. United States v. Huggans*, 650 F.3d 1210, 1218 (8th Cir. 2011), *cert. denied*, 132 S. Ct. 1583 (2012) ("The indictment in this case limited the time frame of the alleged drug conspiracy . . . and specified that the drug involved was cocaine. . . . '[I]n view of these limitations we cannot say that [the defendant] could have failed to realize exactly what conduct the trial concerned.'" (quoting *United States v. Peterson*, 867 F.2d 1110, 1114 (8th Cir. 1989), *overruled on other grounds by United States v. Richardson*, 439 F.3d 421 (8th Cir. 2006))). To the extent that Keys was attempting to challenge venue through this argument, we note that he failed to object to venue in the district court, and in any event there is no question that Kilcoin and Mitchell acted in furtherance of the conspiracy in Nebraska. *See United States v. Romero*, 150 F.3d 821, 824 (8th Cir. 1998) ("[A]lthough separate proof of an overt act is not a necessary element of a drug conspiracy under 21 U.S.C. § 846, venue is proper in a conspiracy case in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." (citations and internal quotation marks omitted)). As a result, the Government needed to prove only that an agreement to distribute crack cocaine existed and that Keys knew of the agreement and knowingly participated in it, *see Jiminez*, 487 F.3d at 1146, regardless of where Keys's own actions occurred.

Keys next argues that the evidence was insufficient to establish these elements because Kilcoin, Mitchell, and other witnesses who hoped to benefit from cooperating with the Government had an incentive to testify falsely against him. Keys emphasizes that Kilcoin's testimony in particular was uncorroborated because the search of Keys's residence uncovered only crack cocaine residue, rather than the distribution-sized quantities described by Kilcoin. Nevertheless, "in reviewing a

defendant's challenge to the sufficiency of the evidence, '[w]itness testimony . . . does not need to be corroborated.'" *United States v. Perez*, 663 F.3d 387, 391 (8th Cir. 2011) (alteration in original) (quoting *United States v. Jefferson*, 652 F.3d 927, 930 (8th Cir. 2011)). Assuming, as we must, that the jury found credible the witness testimony that was favorable to the verdict, that testimony was more than sufficient to establish the elements of the offense, "[a]nd a jury's credibility determinations are virtually unreviewable on appeal." *Id.* (quoting *Jefferson*, 652 F.3d at 930).

As a result, we affirm the denial of Keys's Rule 29 motion for judgment of acquittal.

### C. *Brady* Claim

Keys argues that the introduction of testimony by Evans, Schaaf, and Mitchell that was not prefigured in pretrial interviews or reports constitutes a *Brady* violation.[3] "Under *Brady*, the government must disclose any evidence both 'favorable to an accused' and 'material either to guilt or to punishment.'" *United States v. Whitehill*, 532 F.3d 746, 753 (8th Cir. 2008) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "The disclosure obligation encompasses both substantive exculpatory evidence and evidence that might be valuable in impeaching government witnesses." *United States v. Livingstone*, 576 F.3d 881, 884 (8th Cir. 2009). Such evidence "is

---

[3]Keys objected to the admission of the challenged testimony, but the objections appeared to be based primarily, if not solely, on Jencks Act grounds. See *United States v. Douglas*, 964 F.2d 738, 741 (8th Cir.1992) ("The Jencks Act requires that the prosecutor disclose any statement of a witness in the possession of the United States which relates to the subject testified to by the witness on direct examination."). On appeal, Keys does not argue that the Jencks Act applies. Although Keys did not separately move for a new trial on *Brady* grounds, the Government does not argue that a *Brady* claim based on these objections was forfeited. Therefore, as suggested by the Government, we address the *Brady* claim as if the objection had been preserved.

material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Whitehill*, 532 F.3d at 753 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)).

Here, Keys contends that certain trial testimony by each of Evans, Schaaf, and Mitchell revealed inconsistencies with their respective pretrial reports and interviews. The Government counters that Keys cannot show that earlier disclosure of the substance of the "new" testimony would have altered the result of the proceeding. We agree with the Government.

First, the substance of the challenged testimony is inculpatory, rather than exculpatory: Evans testified that she bought crack cocaine from Keys, Schaaf testified that she saw a set of scales on Keys's counter, and Mitchell testified that he saw other individuals buying crack cocaine from Keys. Second, to the extent Keys argues that the "new" evidence might have been valuable for impeachment purposes, Keys in fact did impeach each of the three witnesses extensively with respect to inconsistencies between their testimony and their previous interviews with investigators and the prosecution. Given that Keys had the opportunity to use the substance of each witness's "new" testimony to impeach the witnesses, we cannot hold that a *Brady* violation occurred in this case. *See United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005) ("Under the rule in our circuit *Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial."). Even if we were to construe the "new" testimony as indicative of the withholding of *Brady* materials, Keys "fails to show that the result of the trial would have been different if he had known beforehand what the witnesses were going to say at trial, because the record reveals that he did in fact effectively cross-examine the co-conspirators about inconsistencies

between what they had said [prior to trial] and what they testified to." *Livingstone*, 576 F.3d at 884.

Accordingly, we reject Keys's *Brady* claim.

## III.   Conclusion

For the foregoing reasons, we affirm the district court's denial of Keys's motion to suppress and request for a *Franks* hearing, denial of his motion for judgment of acquittal, and denial of his attempt to exclude certain testimony.

_____