# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-3823

_____

United States of America

*Plaintiff - Appellee*

v.

Elfred William Petruk

*Defendant - Appellant*

_____

No. 17-3824

_____

United States of America

*Plaintiff - Appellee*

v.

Elfred William Petruk

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: February 15, 2019
Filed: July 11, 2019

_____

Before LOKEN, COLLOTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

A jury convicted Elfred Petruk of one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and one count of possession with intent to distribute 500 grams or more of methamphetamine, in violation of § 841(a)(1) and (b)(1)(A). Petruk was serving a term of supervised release for a prior conviction at the time he committed these offenses. After sentencing him to concurrent 372-month terms of imprisonment on each methamphetamine count, the district court[1] revoked Petruk's supervised release and imposed a consecutive 30-month prison sentence. In these consolidated appeals, Petruk challenges the district court's[2] pretrial denial of his motion to suppress evidence and its posttrial revocation of supervised release.

I

Over a two-week period in September 2016, law enforcement officers across two states obtained four warrants to search three vehicles associated with Petruk: a 1994 Chevrolet Camaro (Camaro), a 2001 Chevrolet Silverado pickup truck

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

[2]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Leo I. Brisbois, United States Magistrate Judge for the District of Minnesota.

(Silverado), and a 2005 Chrysler 300 (Chrysler). Three of the warrants permitted officers to install Global Positioning System (GPS) tracking devices on each of the vehicles. The fourth warrant allowed them to search the Chrysler. The affidavits supporting each warrant application contained largely the same information, but because Petruk challenges each warrant as unsupported by probable cause, we detail below the information contained in each of the affidavits. See United States v. O'Dell, 766 F.3d 870, 874 (8th Cir. 2014) (per curiam) ("When the issuing judge relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." (cleaned up)).

On September 7, 2016, Investigator Scott Williams from the Lake Superior Drug and Violent Crime Task Force applied for a warrant to install the GPS tracker on the Camaro. His supporting affidavit detailed information that different officers had received from four separate confidential informants (CI) connecting Petruk and multiple vehicles to methamphetamine trafficking in the Duluth area. In July 2016, CI-1 informed an officer that Petruk was selling large quantities of methamphetamine and that Petruk primarily drove the Chrysler. The following month, CI-2 told another officer that Petruk was "moving multiple pound quantities of methamphetamine and [was] supplying other known methamphetamine dealers in the [Duluth] area." CI-2 also said that Petruk drove the Chrysler. Also in August, another law enforcement officer received a tip from CI-3 that Petruk had "teamed up" with other known methamphetamine dealers in the area, whom the CI named. In September, CI-3 told the same officer that Petruk "was in possession of a very large quantity of meth and U.S. currency." On both occasions, CI-3 told the officer that Petruk drove multiple vehicles. Finally, CI-4 told Williams in August that Petruk was "moving a lot of weight" of methamphetamine and "driving around in a black Chrysler 300 that 'sticks out,'" and in September told Williams that Petruk was "supplying the town with . . . meth." Williams's affidavit stated that all four CIs said that Petruk's large-scale methamphetamine trafficking would "require him to re-up his supply often." It also

included the type of information each of the CIs had previously provided to law enforcement, which had led to the issuance of multiple search warrants, the seizure of contraband, and the arrest of numerous individuals on drug-related offenses.

According to Williams's affidavit, officers had also independently corroborated some of the information provided by the CIs, in particular with respect to Petruk's vehicles. In late July 2016, Duluth police officers pulled over the Chrysler, and Petruk, who was riding in the passenger seat, claimed to own the car. In late August and early September 2016, officers saw Petruk driving the Camaro with the Silverado following closely behind, which led the officers to believe Petruk was conducting countersurveillance to avoid detection. On one of the occasions, the Silverado was driven by Gina Klobuchar. Officers knew Klobuchar was involved in the drug trade, and they had received a tip that she might be working with Petruk.

Based on this information, Williams sought a warrant to place a GPS tracker on the Camaro. The application stated that officers wanted to be "alerted when Petruk makes trips out of town to re-up his supply" and to "track his movements to other known drug dealers in the area." A Minnesota state court judge issued the warrant on September 7, 2016, and the GPS tracker was installed the next day.

A few days later, on September 12, Wisconsin District Attorney Daniel Blank and Assistant District Attorney Jennifer Bork applied for a warrant to install a GPS tracker on the Silverado. An affidavit by Todd Maas, an investigator for the Superior, Wisconsin, police department, supported the warrant application. Maas's affidavit contained substantially the same information, almost verbatim, that was in Williams's affidavit for the Camaro GPS warrant. A Wisconsin state court judge issued the warrant that same day, and the tracker was installed.

Also on September 12, Blank and Bork applied for a warrant to install a GPS tracker on the Chrysler. That application was also supported by an affidavit from

-4-

Maas. This affidavit was not identical to Maas's affidavit for the Silverado GPS warrant. It did, however, contain the information from all four CIs that Petruk was involved in methamphetamine trafficking; the information from two CIs that Petruk drove the Chrysler as his primary vehicle; and the information about the officers' traffic stop when Petruk claimed to own the Chrysler. That day, a different Wisconsin state court judge issued the warrant, and the GPS tracker was installed.

On the night of September 19, once the GPS trackers were installed on all three vehicles, Cliff Sheppeck, an investigator with the Chisago County Sheriff's Office, applied by telephone for a warrant to search the Chrysler. Sheppeck's affidavit specifically stated that Petruk and an unidentified female were "currently occup[ying]" the car. The affidavit contained substantially the same information that was in the applications for the GPS tracker warrants, including the fact that Petruk had claimed ownership of the Chrysler. But it also added new information that had not been included in any previous warrant applications. By then, a fifth CI had told officers that he had seen Petruk with two ounces of methamphetamine and that Petruk "has methamphetamine on him at all times." Like the others, CI-5 had also previously provided reliable information to law enforcement. In addition, Sheppeck's affidavit stated that CI-3 told an officer that Petruk "ma[de] trips to the [Twin Cities] twice a week to reup his supply of methamphetamine."

Sheppeck's affidavit also stated that GPS tracker warrants for the three vehicles had been issued, and it included information the officers had obtained from the Camaro and Silverado trackers, which corroborated the CI's statement that Petruk was frequently traveling to Minneapolis/St. Paul. In less than a week's time, the officers surveilled Petruk as he made two quick overnight trips from the Duluth area to the Twin Cities and back. The first time, Petruk drove the Camaro. The second time, Petruk drove the Silverado and was accompanied by Klobuchar, whose drug-related activities and criminal history were also included in the affidavit. On the trip in the Camaro, Petruk drove on low-traffic highways and backroads when returning

-5-

to Duluth—a tactic Sheppeck stated was often used by drug traffickers in possession of large quantities of controlled substances to avoid detection and contact with police. And once Petruk was back in Duluth, officers tracked him visiting the homes of known methamphetamine users.

The Chrysler search warrant application also contained information that Petruk, who had prior felony convictions, was armed and may pose a danger to law enforcement. CI-2 told an officer that Petruk stated he would not go back to prison and would "shoot it out with the police." CI-3 told an officer that he had seen Petruk with at least one handgun in the last two weeks. CI-4 also told Williams that Petruk "ha[d] weapons and will use them against police," and CI-5 said that he had seen Petruk with at least one handgun and that Petruk stated he would "not plan to stop for police if the police attempt to stop him in a vehicle." On September 19, a fourth state court judge issued the warrant authorizing officers to search the Chrysler.

That same day, but before officers obtained the warrant, Petruk and a companion drove the Chrysler south to Minneapolis—Petruk's third trip there in eleven days. In Minneapolis, Petruk stopped at some of the same locations he had visited on his two prior trips. None of the tracking information for the Chrysler was included in the application to search that car. Petruk traveled back north to Duluth the next day, stopping at a salvage yard in North Branch, Minnesota. When Petruk got out of the car, officers detained him and drove the Chrysler to the North Branch Police Department to be searched pursuant to the warrant. In the back of the engine compartment, officers found approximately 1.75 pounds of methamphetamine inside a black shopping bag. Officers also found drug paraphernalia, receipts, and a notebook. They also seized Petruk's phone.

Petruk moved to suppress the seized evidence on the grounds that none of the four warrants were supported by probable cause. Following a suppression hearing, the magistrate judge disagreed and recommended the denial of the motion to

suppress. The district court adopted the magistrate judge's report and recommendation. At trial, the government introduced GPS tracking information obtained pursuant to the warrants and various exhibits related to the seized methamphetamine. The jury convicted Petruk on both counts. Immediately after sentencing on the methamphetamine convictions, the district court revoked Petruk's supervised release and sentenced him to a consecutive 30-month term of imprisonment.

## II

We first address Petruk's motion to suppress, followed by his challenge to the supervised release revocation.

## A

On appeal from the denial of a motion to suppress, we review a district court's findings of fact for clear error and its legal conclusions de novo. United States v. Farnell, 701 F.3d 256, 260 (8th Cir. 2012). We affirm unless the denial of the motion "is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." Id. at 260–61 (quoting United States v. Rodriguez-Hernandez, 353 F.3d 632, 635 (8th Cir. 2003)).

At the outset, we address the government's contention that Petruk waived the right to appeal the denial of his suppression motion because defense counsel stated "no objection" at trial when the government moved to introduce evidence that was the subject of the suppression motion. In general, "the overruling of a pretrial motion to suppress makes it unnecessary to object when the evidence is offered at trial," although "it is the better practice for defense counsel to object when the unsuppressed evidence is offered" or to lodge a standing objection at the beginning of trial. See United States v. Martin, 982 F.2d 1236, 1241 & n.3 (8th Cir. 1993); see also United

States v. Neumann, 887 F.2d 880, 885 (8th Cir. 1989) (en banc) ("[A] mandatory pretrial motion to suppress, filed on constitutional grounds in a criminal case, if denied, does not ordinarily have to be renewed by way of objection at trial."). An attorney's statement at trial that he has "no objection" to the introduction of evidence may indicate a waiver of a previous objection. See, e.g., United States v. Johnson, 906 F.2d 1285, 1290 (8th Cir. 1990) ("[Defendant's] counsel stated 'no objection' when the [unsuppressed] evidence was offered at trial. Accordingly, we *could* find that [defendant] waived his previous objection." (emphasis added)). But as with questions of waiver generally, we must examine whether a party "consciously and intentionally waived" any objection to the introduction of evidence. United States v. Wedelstedt, 589 F.2d 339, 345 (8th Cir. 1978) (quoting Lawn v. United States, 355 U.S. 339, 355 (1958)). Here, in pretrial proceedings, Petruk unequivocally contested the admissibility of the evidence seized as a result of the issuance and execution of multiple search warrants. By stating "no objection" at trial to the admission of the relevant evidence, Petruk likely waived the ability to raise on appeal any evidentiary challenges to the disputed evidence. But on this record we find no conscious and intentional waiver of his constitutional challenges, and thus turn to the merits of his claims.[3]

The Fourth Amendment protects persons against unreasonable searches. U.S. Const. amend. IV. Installing a GPS tracker on a vehicle to monitor that vehicle's movements is a search within the meaning of the Fourth Amendment and thus

---

[3]Some of our cases have found waiver of a pretrial motion to suppress when defense counsel simply stated "no objection" to the introduction of unsuppressed evidence at trial. See, e.g., United States v. Comstock, 531 F.3d 667, 675 (8th Cir. 2008); United States v. Gonzalez-Rodriguez, 239 F.3d 948, 951 (8th Cir. 2001). But here, Petruk argues that counsel's statements at trial merely waived *new* objections to the introduction of unsuppressed evidence under, for example, the Federal Rules of Evidence. In any event, despite finding waiver, these cases went on to analyze the merits of the Fourth Amendment claim. See Comstock, 531 F.3d at 675–78; Gonzalez-Rodriguez, 239 F.3d at 951.

generally requires a warrant.  United States v. Faulkner, 826 F.3d 1139, 1144 (8th Cir. 2016) (citing United States v. Jones, 565 U.S. 400, 404–05 (2012)); see Farnell, 701 F.3d at 261 (explaining that subject to a few well-established exceptions, the Fourth Amendment requires that searches be conducted pursuant to a warrant).  The "[i]ssuance of a search warrant must be supported by probable cause," which exists when, "under the totality of the circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place."  Faulkner, 826 F.3d at 1144. When reviewing the issuance of a warrant, we afford great deference to the issuing judge's probable-cause determination, ensuring only that the judge "had a substantial basis for concluding that a search would uncover evidence of wrongdoing."  Illinois v. Gates, 462 U.S. 213, 236 (1983) (cleaned up).

Like the district court, we conclude that the affidavits supporting each of the GPS warrant applications provided probable cause to believe that Petruk was involved in methamphetamine trafficking and that the location data from the vehicles would lead to evidence of that trafficking.  In this case, four confidential informants provided information indicating that Petruk had teamed up with other known drug dealers to sell large quantities of methamphetamine in the Duluth area and was using multiple vehicles to travel regularly to Minneapolis/St. Paul to resupply.  It is well-established that "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause for a search warrant."  United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998).  The key inquiry is whether the confidential informant's information is, in fact, reliable.  See, e.g., United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993).  As we have repeatedly recognized, "[w]hen an informant has provided reliable information in the past *or* where his tip was independently corroborated, a court may deem the informant's tip sufficiently reliable to support a probable cause determination."  United States v. Caswell, 436 F.3d 894, 898 (8th Cir. 2006) (emphasis added).

As the district court found, both indicia of reliability were present here. The supporting affidavits established that all four CIs had a record of providing reliable information to law enforcement. Each of the CIs had provided information that led to the arrest of multiple individuals who were selling controlled substances, and also to the issuance of one or more search warrants that resulted in the seizure of controlled substances. Two of the CIs had also conducted one or more controlled purchases of illegal drugs. Moreover, the information provided by the CIs in Petruk's case was corroborated not only by the other CIs, but by law enforcement officers as well. See, e.g., United States v. Keys, 721 F.3d 512, 518 (8th Cir. 2013) ("[T]he receipt of consistent information from two separate sources is a form of corroboration."). Through multiple personal observations, officers learned that Petruk drove various vehicles and that he was connected to at least one other known methamphetamine trafficker in the area—Klobuchar. See id. (affirming probable-cause determination where two sources corroborated each other and officers verified details provided by one of the sources).

Petruk nevertheless argues that the warrants were not supported by probable cause because the corresponding applications did not state the basis of the CIs' knowledge and because the information they provided was "stale." First, it is true that "[w]hen an affidavit in support of a search warrant is based upon information from an informant, the informant's 'reliability, veracity, and basis of knowledge are relevant considerations.'" Faulkner, 826 F.3d at 1144 (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). But they are not "independent, essential elements" to finding probable cause. Id. (quoting Reivich, 793 F.2d at 959); see also Gates, 462 U.S. at 230–33. Indeed, a "deficiency" in either the informant's reliability or his basis of knowledge "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Gates, 462 U.S. at 233. In this case, the CIs' reliable track record and the officers' independent corroboration make up for any deficiency in basis of knowledge.

-10-

Second, although information supporting a warrant can become "stale" if it is not "sufficiently close in time to the issuance of the warrant and the subsequent search," United States v. Davis, 867 F.3d 1021, 1028 (8th Cir. 2017) (quoting United States v. Johnson, 848 F.3d 872, 877 (8th Cir. 2017)), cert. denied, 138 S. Ct. 1441 (2018), there is no staleness problem here. "We have no fixed formula for deciding when information has become stale, but we consider the nature of the crime being investigated and the property to be searched." Id. (quoting United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008)). Where the crime under investigation is "of a continuous nature," the passage of time between the last described act and the application for a warrant is less significant. See, e.g., United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995) (concluding that given the continuing nature of the crime of unlawful possession of weapons, three-year-old and four-month-old information included in supporting affidavit was not stale). Here, the information that officers received from July to early September 2016 indicated that Petruk was engaged in ongoing large-scale methamphetamine distribution involving several vehicles, such that any time lapses between the provision of the information and the applications for the search warrants did not render the information stale. See Davis, 867 F.3d at 1028 (concluding that, in ongoing narcotics investigation, information of drug-related activity provided over a several-week period was not stale); United States v. Day, 949 F.2d 973, 978 (8th Cir. 1991) ("[I]nformation about criminal activity at an earlier, unspecified time may combine with factually connected, recent, time-specific information to provide a substantial basis for the conclusion that the criminal activity described in an affidavit is sufficiently close in time to the search warrant application.").

As to the warrant to search the Chrysler, Petruk argues that the warrant application was fatally flawed because it failed to establish a sufficient link between

drugs and the Chrysler, thus failing to demonstrate the necessary place-object nexus.[4] See United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000) ("[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue . . . ."). We disagree. Sheppeck's affidavit contained sufficient information from which an issuing judge could conclude that there was a reasonable probability that evidence of drug-trafficking—not just actual drugs—would be found in the Chrysler, Petruk's primary vehicle. See Caswell, 436 F.3d at 899 (recognizing that issuing judges are "entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense" (cleaned up)). As detailed in Sheppeck's affidavit, a fifth CI had come forward stating that Petruk carried methamphetamine with him at all times and that he had personally seen Petruk with at least two ounces of the drug. By then, CI-3 had also told law enforcement that Petruk drove his vehicles to the Twin Cities twice a week to resupply. Moreover, the officers had *observed* Petruk make two quick turnaround trips to the Twin Cities in a week's time using vehicles linked to the trafficking. When Petruk returned from one of those trips, he was tracked visiting the homes of known drug users. And, at the time Sheppeck applied for the warrant, Petruk was "occupying" the Chrysler. Collectively, this information provided a sufficient nexus between drug-trafficking evidence and the Chrysler.[5]

---

[4]Petruk also argues that Sheppeck was a "straw affiant" who had no personal knowledge of the information contained in his affidavit, some of which was "cut and pasted" from another affidavit. But Sheppeck states expressly that he "learned from" Williams the information included in the affidavit. In any event, even if Sheppeck's affidavit could have been more carefully written, "we do not attach constitutional significance" to the affidavit's purported deficiencies. United States v. Hyten, 5 F.3d 1154, 1156 (8th Cir. 1993) (concluding that it was an "error of technical rather than constitutional magnitude" for warrant to have the incorrect name of the officer who signed affidavit and obtained warrant).

[5]Petruk also makes much of the fact that Sheppeck's affidavit did not contain key evidence officers had obtained from the Chrysler GPS tracker: that when officers sought the Chrysler search warrant, Petruk had already driven to the Twin Cities.

The district court properly denied Petruk's motion to suppress all evidence derived from the execution of the warrants.

## B

Petruk's sole challenge to the revocation of his supervised release is that it was premised on his methamphetamine convictions in this case, which he contends should be reversed in light of his suppression arguments. But because we conclude that the district court properly denied Petruk's motion to suppress, there is no basis for disturbing his convictions or his revocation of supervised release.

For all the aforementioned reasons, we affirm.[6]

_____

Had the officers included that fact, the warrant application would have provided further support for a finding of probable cause. But, as described, the warrant application as submitted sufficiently supported a finding of probable cause. Additionally, to the extent that Petruk also advances basis-of-knowledge and staleness arguments to challenge the Chrysler search warrant, we reject those contentions for the reasons explained in the context of the GPS warrants.

[6]Petruk's pro se motion for leave to amend the reply brief is denied, as it appears to raise arguments that were not included in his opening brief. See United States v. Picardi, 739 F.3d 1118, 1123 n.3 (8th Cir. 2014).